Gary A. GOODMAN, d/b/a Goodman Construction, **Appellee,**

v.

**CITY OF Le CLAIRE, Iowa, Appellant.**

**No. 96–2291.**

Supreme Court of Iowa.

Dec. 23, 1998.

Richard M. Roller and Richard J. Trinrud of Anderson & Nelson, P.C., Davenport, for appellant.

Robert C. Bradfield, Davenport, for appellee.

Considered by McGIVERIN, C.J., and CARTER, LAVORATO, SNELL, and CADY, JJ.

LAVORATO, Justice.

The city of Le Claire, Iowa appeals from an adverse jury verdict rendered in favor of Gary A. Goodman, d/b/a Goodman Construction. Goodman alleged that the city was negligent in excavating dirt and waste material on his property, declaring the same a nuisance, removing both the dirt and waste material from his property, and charging him costs for doing so. The issue on appeal is whether the specifications of negligence Goodman alleged against the city fall within the discretionary function exception of Iowa Code section 670.4(3) (1993). We hold that they do and for that reason the city is exempt from liability for its actions. We reverse and remand with directions.

## I. Facts.

Gary A. Goodman was the proposed developer of a new subdivision known as Emerald Woods Second Addition to Le Claire. In March 1992, Goodman asked the city of Le Claire to expand an existing tax incremental financing district (TIF) to include his development in the district. A TIF district is a financing mechanism a municipality may use to finance improvements in a subdivision. The improvements include streets, sewers, grading, and water. The municipality issues bonds to pay for the improvements. Taxes generated from new homes built in the subdivision are redistributed back to the municipality to pay off the bonds.

The city accommodated Goodman by expanding one of its two TIF districts to include Goodman's subdivision. In the summer of 1992, the city entered into a development agreement and an assessment agreement with Goodman. However, instead of letting Goodman construct the improvements, the city decided to let bids for the construction because the latter process would be less costly. The lowest bidder was Oetzel Construction.

Work on the improvements began in April, 1993. About a month later on May 19, Shive–Hattery, the project engineers, contacted city administrator Edwin Choate and told him that the contractor, Oetzel Construction, had uncovered what appeared to be a landfill or dump. The contractor uncovered tires, broken concrete, pipe, car parts, bed springs, broken glass, water heaters, and household garbage.

Because the sloping terrain of the subdivision interfered with the proper elevation of a city street that was being constructed, the contractor had to move a large amount of dirt from one side of the street to the other side. It was during this dirt-moving process that the contractor made the discovery.

Over the next several days, Choate and the engineers discussed available options to deal with the waste material the contractor had uncovered. During this time frame, the engineers consulted their own experts. Choate and the engineers were somewhat familiar with state law requirements concerning the discovery of a landfill. They looked at the Iowa Code, administrative regulations, and the city's own nuisance ordinance to further familiarize themselves with their responsibilities.

Choate contacted Goodman on May 21 and told him that the contractor had uncovered what appeared to be a landfill. Choate also told Goodman that he and the engineers were researching what options were available

and what courses of action to take to deal with the waste material.

On May 26 Choate and the city attorney met with Goodman to make a decision about what to do. The group decided to determine the extent of the landfill, excavate it, and then move it out of the immediate area of construction. They decided to defer any decision about how to dispose of the fill.

On the same day and at the engineer's suggestion, the city dug test holes to determine the size of the fill. The city determined the extent of the fill was about 2600 cubic yards. After researching various statutes and ordinances and consulting with its attorney and project engineers and their experts, the city concluded that it was dealing with a landfill and for that reason had no other choice but to dispose of it in a proper fashion according to state law.

In accordance with that conclusion, Choate authorized the contractor to excavate the fill and stockpile it. From engineering calculations, Choate was able to determine that about seven percent of the landfill material was on the city's right-of-way and the remainder was on Lots 4 and 5 of Goodman's subdivision.

The city and Goodman agreed that the excavated fill should be moved to Lot 6 of Goodman's subdivision. They also agreed that the fill should be relocated in a short period of time.

Soil samples taken by the engineers confirmed that no hazardous materials were present. So there were no concerns for any soil contamination or water pollution.

Armed with all of this information, Choate contacted the Iowa Department of Natural Resources (IDNR) for advice about what to do with the 2600 cubic yards of excavated fill and waste material. The IDNR told Choate that because of the waste material that had been uncovered, the city had to dispose of it at a state-authorized landfill.

In July the city council considered removing the excavated fill and waste material at a cost of about $29,000. Later in the month, the council made a preliminary determination to declare the excavated fill and waste material a nuisance. The declaration was done according to a city nuisance ordinance.

Nothing further was done until April 1994 when the city council implemented the formal nuisance abatement process according to procedures outlined in the nuisance ordinance. Pursuant to these procedures, the city gave Goodman notice that a nuisance existed on his property and advised him of the steps he had to take to abate the nuisance. He was also advised he had the right to a hearing.

The delay between the declaration and implementation was for two reasons. The city was working with Goodman for a resolution of the problem, hoping that his insurance policy might cover the expense of removal. Additionally, the city was fairly busy dealing with problems resulting from the flood of 1993.

Goodman asked for a hearing during which some options were discussed. At this point the city was still trying to work with Goodman to resolve the issue.

In October, in a letter to the council, Goodman proposed that he sift through the excavation pile and separate the waste material from it. He would then push the suitable dirt into a ravine located immediately southwest of the pile. The city would be responsible for removing the waste material. Goodman's proposed cost for his work was $26,000, which he suggested could be paid from TIF funds. The council rejected the proposal.

Later in October, Choate advised the council of an alternative proposal that he thought would be cheaper than what Goodman had proposed. Volunteers would sift through the pile and separate the waste material, which the city would then haul to a landfill. The dirt would be used as fill on the city's levee that had been damaged in the 1993 flood.

After letting bids for removal of the dirt, the city engaged the lowest bidder to move the dirt to the levee at a cost of $5,744. The removal was done after Choate obtained permission from the Corp of Engineers and the IDNR. The sifting and removal was completed in December.

The city then notified Goodman by certified letter that (1) the nuisance had been

abated; (2) he would be assessed the cost associated with the abatement, less the city's seven percent share of the cost; and (3) he had to pay the costs to abate the nuisance within thirty days. The notice was sent pursuant to the nuisance ordinance. The costs assessed amounted to $6,677.40. The record does not indicate that Goodman ever paid the costs assessed to him.

## II. Proceedings.

In September 1995, Goodman filed a five-count petition against the city. Only two of the counts are material to this appeal. Both counts, grounded on negligence theories, summarized the actions of the city in (1) excavating and removing the fill and (2) declaring the excavated fill a nuisance. In one count, Goodman asked the court to find that he was not responsible for the costs associated with removing the nuisance. In the other count, Goodman asked for judgment in the amount of $10,500, representing the value of the dirt the city had taken for its levee.

The district court denied the city's two motions to dismiss the two counts. The motions alleged that the city was immune from tort liability pursuant to Iowa Code section 670.4(3).

The jury returned a verdict of $16,432—roughly $10,000 for the value of the dirt and the balance for the costs the city had assessed against Goodman for removing the alleged nuisance.

The city appealed. Goodman has not filed a brief and did not appear at oral arguments.

As it did in its motions to dismiss and in its motions for directed verdict, the city contends that it is immune from liability because Goodman's allegations of negligence submitted to the jury fall within the discretionary function exception of Iowa Code section 670.4(3).

## III. Applicable law.

Iowa Code section 670.4(3) (previously codified at Iowa Code section 613A.4(3)) affords immunity to a municipality for

[a]ny claim based upon an act or omission of an officer or employee of the municipality, *exercising due care*, in the execu-

tion of a statute, ordinance, or regulation whether the statute, ordinance or regulation is valid, or based upon the exercise or performance or the failure to exercise or perform a *discretionary function or duty* on the part of the municipality or an officer or employee of the municipality, whether or not the discretion is abused.

Iowa Code § 670.4(3) (emphasis added). The first part of the provision deals with acts or omissions of municipal officers or employees exercising due care in carrying out statutes, ordinances, or regulations, whether valid or not. Thus, the provision bars tests by tort actions of the legality of statutes, ordinances, and regulations. The immunity attaches to actions or omissions of municipal officers or employees in carrying out statutes, ordinances, and regulations only if such officers or employees were not acting negligently.

The second part of the provision immunizes acts of discretion in the performance of governmental functions or duty, whether or not the discretion is abused. Not only are municipalities covered by the immunity, but their officers and employees exercising discretion are also covered. This is so whether or not negligence is alleged to have occurred.

Section 670.4(3) "brings municipal tort liability into alignment with the State Tort Claims Act." *Hansen v. City of Audubon*, 378 N.W.2d 903, 905 (Iowa 1985). Iowa Code section 669.14(1) of the State Tort Claims Act and section 670.4(3) are almost identical in language. (Iowa Code section 669.14(1) was previously codified at Iowa Code section 613.4(3).)

Section 670.4(3) also closely parrots the language of the Federal Tort Claims Act at 28 U.S.C. § 2680(a), which provides immunity to the United States government for

[a]ny claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Gov-

ernment, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a) (1998).

We have recognized that the legislature intended the Iowa State Tort Claims Act to have the same effect as the Federal Tort Claims Act because the Iowa act is modeled after the federal act. *Feltes v. State*, 385 N.W.2d 544, 547 (Iowa 1986). For this reason we have given great weight to relevant federal decisions interpreting the federal act. *Id.*

Because the municipal, state, and federal immunity provisions are almost identical in language, we think relevant federal decisions interpreting the federal immunity provision are persuasive authority in our interpretation of the municipal immunity provision.

Before exploring the merits of the city's appeal, we think it is imperative to explore first the meaning of a discretionary act or duty. This court has used the planning/operational dichotomy from *Dalehite v. United States*, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953), in determining whether an act is discretionary for immunity purposes. *See, e.g., Keystone Elec. Mfg. v. City of Des Moines*, 586 N.W.2d 340, 347 (Iowa 1998); *Butler v. State*, 336 N.W.2d 416, 419 (Iowa 1983); *Stanley v. State*, 197 N.W.2d 599, 603 (Iowa 1972). The difficulty lies in determining the line of demarcation between acts constituting planning and operational acts. In *Butler*, this court tried to flesh out the difference between the two levels:

The planning level is generally characterized as the policy[-]making stage and is said to encompass decisions "that involve the formulation of policy, that call for a weighing of competing interests, that require an assessment of the practicability or feasibility (including the consideration of budgetary constraints) of a proposed course of action, or that entail an evaluation of how the public interests will best be served." Thus the initial decision to undertake a project falls within the immunity of the planning stage.

The implementation of decisions made at the planning level is operational; decisions made at the operational level are not covered by the discretionary function excep-

tion. For example, in the area of highway construction and repair " [o]nce the decision [has been] made to construct [or repair] a ... freeway ..., the State [is] obligated to use due care to make certain that the freeway [meets] the standard of reasonable safety for the traveling public."

The distinction between the two levels is best illustrated in terms of judicial review. Policy decisions, such as when and where to construct a freeway, involve the weighing of the merits of social, political and economic factors traditionally held to be within the purview of the legislature. Judicial review of such decisions would be an apparent violation of the separation of powers principle. Decisions made at the operational level, however, do not involve the same overriding policy determinations and can readily be reviewed under judicially manageable tort standards of due care and reasonableness.

*Butler*, 336 N.W.2d at 419–20 (citations omitted).

Although *Dalehite* used the planning/operational dichotomy, the Court made clear that

[i]t is unnecessary to define, apart from this case, precisely where discretion ends. It is enough to hold, as we do, that the "discretionary function or duty" that cannot form a basis for suit under the Tort Claims Act includes more than the initiation of programs and activities. It also includes determinations made by executives or administrators in establishing plans, specifications or schedules of operations. Where there is room for policy judgment and decision, there is discretion. It necessarily follows that acts of subordinates in carrying out the operations of government in accordance with official directions cannot be actionable. If it were not so, the protection of section 2680(a) would fail at the time it would be needed, that is, when a subordinate performs or fails to perform a causal step, each action or nonaction being directed by the superior, exercising, perhaps abusing, discretion.

*Dalehite*, 346 U.S. at 35–36, 73 S.Ct. at 968, 97 L.Ed. at 1440–41 (footnotes omitted). We cited with approval this passage in *Nord-*

brock v. State, 395 N.W.2d 872, 876 (Iowa 1986), in applying the discretionary function exception of the Iowa Tort Claims Act to the conduct of bank examiners who were given broad statutory powers in bank examinations and supervision.

Since *Dalehite*, the Supreme Court in a series of cases has refined the analysis of distinguishing discretionary acts from non-discretionary acts.

1. *United States v. Varig Airlines*, 467 U.S. 797, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984). This case dealt with regulation of the airlines. Again, the Court acknowledged that "it is unnecessary—and indeed impossible—to define with precision every contour of the discretionary function exception." *Varig Airlines*, 467 U.S. at 813, 104 S.Ct. at 2764, 81 L.Ed.2d at 674. The Court, however, isolated two factors useful in determining when the acts of a government employee are protected by the discretionary function exception:

> First, it is the nature of the conduct, rather than the status of the actor, that governs whether the discretionary function exception applies in a given case.... Thus, the basic inquiry concerning the application of the discretionary function exception is whether the challenged acts of a Government employee—whatever his or her rank—are of the nature and quality that Congress intended to shield from tort liability.
>
> Second, whatever else the discretionary function exception may include, it plainly was intended to encompass the discretionary acts of the Government acting in its role as a regulator of the conduct of private individuals.... Congress wished to prevent judicial "second-guessing" of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort. By fashioning an exception for discretionary governmental functions, including regulatory activities, Congress took "steps to protect the Government from liability that would seriously handicap efficient government operations."

*Id.* at 813–14, 104 S.Ct. at 2764–65, 81 L.Ed.2d at 674–75 (citation omitted).

In *Nordbrock*, we cited with approval these two factors and applied them in concluding that the negligent acts alleged against field bank examiners fell within the discretionary function exception. 395 N.W.2d at 876.

2. *Berkovitz v. United States*, 486 U.S. 531, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988). In this case an infant contracted polio after being administered an oral polio vaccine. A suit on her behalf alleged that the National Institutes of Health's Division of Biologic Standards and the Food and Drug Administration were negligent in licensing and releasing the vaccine manufactured by Lederle Laboratories. In *Berkovitz*, the Court employed a two-step analysis to guide courts in determining whether the challenged conduct falls within the discretionary function exception. First,

> [i]n examining the nature of the challenged conduct, a court must consider whether the action is a matter of choice for the acting employee. This inquiry is mandated by the language of the exception; conduct cannot be discretionary unless it involves an element of judgment or choice. Thus, the discretionary function exception will not apply when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow. In this event, the employee has no rightful option but to adhere to the directive. And if the employee's conduct cannot appropriately be the product of judgment or choice, then there is no discretion in the conduct for the discretionary function exception to protect.

486 U.S. at 536, 108 S.Ct. at 1958–59, 100 L.Ed.2d at 540–41 (citations omitted).

Second, even though the challenged conduct involves an element of judgment,

> a court must determine whether that judgment is of the kind that the discretionary function exception was designed to shield. The basis for the discretionary function exception was Congress' desire to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." The exception, properly construed, therefore

protects only governmental actions and decisions based on considerations of public policy. In sum, the discretionary function exception insulates the Government from liability if the action challenged in the case involves the permissible exercise of policy judgment.

*Id.* at 536–37, 108 S.Ct. at 1959, 100 L.Ed.2d at 541 (citations omitted).

3. *United States v. Gaubert,* 499 U.S. 315, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991). This case involved governmental intervention in the running of an allegedly unstable savings and loan. The plaintiff, a shareholder of the savings and loan, alleged federal regulators were negligent in the supervision of the savings and loan association's day-to-day operations. The Court applied the two-step analysis it set out in *Berkovitz* in concluding the challenged actions fell within the discretionary function exception. In the course of its discussion, the Court discussed three scenarios involving statutes, regulations, or policies:

Under the applicable precedents, therefore, if a regulation mandates particular conduct, and the employee obeys the direction, the Government will be protected because the action will be deemed in furtherance of the policies which led to the promulgation of the regulation. If the employee violates the mandatory regulation, there will be no shelter from liability because there is no room for choice and the action will be contrary to policy. On the other hand, if a regulation allows the employee discretion, the very existence of the regulation creates a strong presumption that a discretionary act authorized by the regulation involves consideration of the same policies which led to the promulgation of the regulations.

*Id.* at 324, 111 S.Ct. at 1274, 113 L.Ed.2d at 347 (citation omitted).

As for the planning/operational dichotomy, the Court weakened its use as a tool of analysis in the determination of the discretionary function exception:

In light of our cases and their interpretation of § 2680(a), it is clear that the Court of Appeals erred in holding that the exception does not reach decisions made at the operational or management level of the bank involved in this case. A discretionary act is one that involves choice or judgment; there is nothing in that description that refers exclusively to policymaking or planning functions. . . . Discretionary conduct is not confined to the policy or planning level. . . . The Courts first use of the term "operational" in connection with the discretionary function exception occurred in *Dalehite,* where the Court noted that "[t]he decisions held culpable were all responsibly made at a planning rather than operational level and involved considerations more or less important to the practicability of the Governments fertilizer program." . . . [T]he distinction in *Dalehite* was merely a description of the level at which the challenged conduct occurred. There was no suggestion that decisions made at an operational level could not also be based on policy.

Id. at 325–26, 111 S.Ct. at 1275, 113 L.Ed.2d at 348–49 (citation omitted).

■ The city urges us to adopt the *Berkovitz* two-step analysis in determining whether a challenged action falls within the discretionary function exception, and we do. In adopting this analysis, we are mindful that this is a significant shift from the planning/operational bright line test we have been using. But as *Gaubert* makes clear, we—like many other courts—have misinterpreted *Dalehite* as holding that the discretionary function exception does not reach any decisions made at the operational level.

Recently, we concluded that the acts of a municipality not to undertake emergency measures in a particular area of the city against flooding was an operational decision and therefore outside the discretionary function exception. *See Keystone Elec. Mfg.,* 586 N.W.2d at 347. We applied the planning/operational analysis because there was no contention that we do otherwise.

Nevertheless, had we engaged in a *Berkovitz* two-step analysis, we would have reached the same result. We say this because there was evidence that the city ignored one of its own criteria in its flood emergency plan as to when to commence flood emergency operations. *Id.* at 344. That

criterion directed the city to maintain contact with the United States Weather Bureau during periods of expected high flood stages and to take prompt steps to execute preparations for impending floods when the Weather Bureau forecasts indicated a substantial rise in the river stage. There was evidence that the Weather Bureau had predicted a river crest that would result in flooding of the area in question. The evidence further indicated the city ignored this prediction and took no measures to protect the area against the impending flood. *Id.* The river did crest as predicted and flood waters damaged the plaintiffs' properties. *Id.*

## IV. Analysis.

We turn to Goodman's specifications of negligence, which were submitted to the jury, to determine whether they fall within the discretionary function exception. Those specifications of negligence included the following: The city (1) improperly and without sufficient information determined that a portion of Goodman's subdivision contained landfill material, (2) improperly excavated and removed the dirt and material from its location and stockpiled it, and (3) improperly declared the stockpiled material a nuisance, removed and disposed of the same, and assessed the cost of removal to Goodman.

 Goodman presented expert testimony of Michael Shamsie, an environmental engineer, to support the first two specifications of negligence. Shamsie based his opinions on the field notes of the city's project engineers, Shive–Hattery, and the testing that was done for the presence of hazardous material.

According to Shamsie, the city would have been justified in excavating the volume of dirt that was excavated if testing indicated contaminants listed by law as toxic or hazardous to the environment were present in the area excavated. Because the city's own testing indicated no presence of such contaminants, Shamsie believed there was no need to excavate 2600 cubic yards of dirt.

Shamsie described some of the material uncovered (broken concrete, pipe, car parts, bed springs, broken glass, and water heaters) as inert items that could have been left in place unless they interfered with the foundations of the homes that were being built. According to Shamsie, the material that was uncovered was less than one percent of the dirt that was excavated. In Shamsie's opinion, these were additional reasons why the city unnecessarily excavated and removed 2600 cubic yards of dirt.

Shamsie, however, conceded that the city was required by law to remove the tires uncovered to an approved landfill or pay the cost of having them recycled. In addition, Shamsie conceded that the city would also have been justified in excavating the 2600 cubic yards of dirt had it uncovered a closed dump. According to Shamsie, state regulations require material taken from a closed dump be removed to a sanitary landfill. In his opinion, however, based on the amount of waste material uncovered and based on his own experience, the city was not dealing with a closed dump.

At the time of the discovery, all the city knew was that it was dealing with what appeared to be an abandoned landfill, a dump in common parlance. The law gave the city no specific criteria to follow to determine whether the area at one time had been a dump. For example, how much waste material does it take to make a dump? In these circumstances, Choate acting on behalf of the city had considerable discretion in making that determination. Choate was on the horns of a dilemma: If the city had left the material in place, it could have been in violation of the law; excavating the area as it did could subject the city to potential liability to Goodman.

In these circumstances, Choate made the judgment that he was dealing with an abandoned landfill and that if he erred he would err on the side of the environment and compliance with the law. Because Choate's action was a product of judgment, his conduct meets the first of the two-part *Berkovitz* test—the conduct of the acting government employee must be the product of judgment or choice.

The uncovered waste material posed environmental concerns as well as concerns with compliance with the law. Leaving the waste material where it was found without further

investigation and action, could have resulted in damage to the environment and subjected the city to possible adverse economic consequences for violating the law. For this reason, the action Choate took was based on considerations of public policy grounded on social, economic, and political reasons. Choate's conduct therefore meets the second of the two-part *Berkovitz* test—the challenged conduct involves an element of judgment based on public policy.

Whether Choate abused his discretion or was negligent in his decision to excavate the amount of dirt that was excavated is irrelevant. His conduct in this respect fell within the discretionary function exception of section 670.4(3).

■ The final specification of negligence charged the city with improperly declaring the stockpiled material a nuisance, removing and disposing of the same, and assessing cost of removal to Goodman. Goodman's theory here is that if the city negligently determined the excavated area was a landfill and thus improperly excavated 2600 cubic yards of dirt, it had no basis for declaring the stockpiled material a nuisance and assessing the costs of abatement to him.

We have already concluded Choate's determination that the area was a landfill and his subsequent decision to excavate the 2600 cubic yards of soil containing the waste fell within the discretionary function exception. All of the reasons we have cited for this conclusion apply with equal force to the final specification of negligence. Thus, the city's action declaring the stockpiled material a nuisance and assessing the costs of abatement to Goodman likewise fell within the discretionary function exception.

## V. Conclusion.

Because all of the specifications of negligence submitted to the jury fell within the discretionary function exception of Iowa Code section 670.4(3), the city is exempt from liability. The jury's verdict based upon these specifications of negligence cannot stand. Accordingly, we reverse and remand for an order dismissing this case with costs assessed to Goodman.

**REVERSED AND REMANDED WITH DIRECTIONS.**