Tony ETTE, By His Father and Next Friend Robert ETTE, and Robert Ette, Individually, Appellants,

v.

LINN–MAR COMMUNITY SCHOOL DISTRICT a/k/a Linn–Mar School District, Kevin Makinster, Steve Colton and Joe Pacha, Appellees.

No. 01–0487.

Supreme Court of Iowa.

Dec. 18, 2002.

As Amended on Denial of Rehearing Feb. 7, 2003.

Tom Riley of Tom Riley Law Firm, P.L.C., Cedar Rapids, for appellants.

Terry J. Abernathy and Thad J. Collins of Pickens, Barnes & Abernathy, Cedar Rapids, for appellees.

NEUMAN, Justice.

Linn–Mar High School has adopted what is commonly known as a "zero tolerance" policy concerning students' use or possession of tobacco, alcohol, and drugs. This case involves a ninth grader who was caught with cigarettes while on a school band trip to San Antonio, Texas. He was returned home, alone, via Greyhound bus. The youngster survived the 1100–mile journey, but his distraught father sued the school district for negligent endangerment and other alleged wrongs. This appeal follows the district court's directed verdict for the school district.

The principal question on appeal is whether the discretionary function exception of our municipal tort claims act, Iowa Code section 670.4(3) (1999), immunizes the school district for its decision, right or wrong, to send the youngster home. The district court believed the statute barred the parent's negligence claims. Because we do not believe section 670.4(3) was designed to shield the school from an alleged breach of its duty of care and supervision toward students in its charge, we reverse that portion of the district court's decision and remand for a new trial. We affirm, however, the dismissal of the plaintiffs' other claims.

## I. Facts.

The material facts are largely undisputed. Plaintiff, Tony Ette, attended Linn–Mar High School and played musical instruments in both the band and orchestra. In order to participate in these activities, Tony and his father, plaintiff Robert Ette, were required to sign a Co–Curricular Conduct Policy which prohibited the possession or use of "tobacco, alcohol or other drugs at any time (year round)" during his high school career. A first-time violator risked forfeiture of twenty percent of public performances and mandatory counseling. Both Tony and his father signed the agreement knowing full well that, even as a freshman, Tony regularly smoked cigarettes. He was otherwise a good student and not a discipline problem.

During the spring semester of his freshman year, Tony signed up for the music department's trip to San Antonio, Texas. It was an event of major proportions—405 students, eleven buses, and over seventy chaperones. Tony received a booklet containing several pages of trip rules, including the following:

All Linn–Mar students are expected to know and comply with the following rules. Violation of these rules will result in direct chaper-

one supervision of the student(s) and a limit on activity privileges. Serious violations (alcohol, drugs, or repeated failure to comply with directions) can result in the student being sent home at his/her own expense immediately. Directors have the right to search luggage and rooms at any time on the trip.

1. **PROHIBITED SUBSTANCES.** No possession or consumption of drugs, alcohol or tobacco is allowed. . . .

. . . .

12. **GOING HOME EARLY.** You will be sent home if you violate certain rules. Any instances involving drugs, alcohol or weapons will be dealt with in this manner. Repeated refusals to comply with the rules and curfew infractions, will also result in an early trip home. Your parents will be notified and you will be taken to the Greyhound Bus Depot in San Antonio and put on the next bus home.

| Depart San Antonio | Transfers | Arrive in CR | Travel Time |
|---|---|---|---|
| 5:00 AM | 3 | 12:45 PM | 31 hrs., 45 min. |

Cost for a one-way ticket is $119.00. Your parents will need to wire the money to you if you do not have enough with you. Obviously, we do not want this to happen, but it will happen if there is a need.

Both Tony and his father read the rules and acknowledged their understanding of them by signing a written trip agreement. The agreement specifically noted that the signing parties understood "violations of some of these rules (such as use or possession of alcohol, drugs, or weapons, or repeated failure to comply with the enclosed rules) will cause [the student] to be sent home at his/her own expense." The rules further provided, and the plaintiffs agreed by their testimony, that final decisions regarding inappropriate student behavior rested with the music directors.

Contrary to his father's wishes, and in knowing violation of the rules, Tony took cigarettes with him and discreetly smoked them on the way down to Texas whenever the opportunity arose. Upon the group's arrival in San Antonio, Tony went out for some food and a smoke. When he returned to his hotel room, he discovered that not only had his roommates been smoking in the room but two girls had been invited in, another violation of the rules. Tony criticized their risky behavior

and a brief argument ensued. The roommates and their friends then left the room. Tony lay down for a nap.

Meanwhile, a chaperone had smelled cigarette smoke wafting from the boys' room. The trip directors, defendants Steve Colton and Kevin Makinster, proceeded to investigate. They found Tony in the room, advised him of the report and asked to conduct a search. Tony emptied his pockets, revealing his lighter and cigarettes. He explained that his roommates had been smoking in the room, not him. Makinster attempted to verify Tony's claim, but Tony's roommates successfully concealed their cigarette possession and denied any misconduct. Colton and Makinster then made the decision to send Tony back home on the next available Greyhound, in keeping with the trip rules.

At this point the parties' recollection of events diverges somewhat. Colton telephoned Tony's father. Robert says he asked Colton to put his son on an airplane instead of a bus or, at the very least, to

have one of the chaperones accompany Tony on the bus ride home. Colton countered that he was the one who suggested the airplane trip as an alternative. He claimed that Robert did not respond to that offer, most likely for financial reasons. Colton acknowledged that he considered and rejected Robert's request for a chaperone due to a variety of concerns, financial and otherwise, that such an alternative presented.

Colton took Tony to the bus station for an 11:55 p.m. departure. The trip from San Antonio to Cedar Rapids would include stops and layovers in Dallas, Tulsa, Kansas City, Des Moines, and Iowa City. Tony had just enough money to buy the ticket, so Colton insisted on paying one-half and taking an IOU so Tony would have money for food along the way. They called Robert again from the station. Colton reported that he sounded confused and distraught.

Colton stayed with Tony until he boarded the bus. At no time did Tony protest the arrangements. When Tony reached Tulsa and attempted to buy a meal, he discovered his wallet was missing. He suspected he had been the victim of a pickpocket at the depot in Dallas. He was also solicited to buy marijuana there. Other than these two incidents, Tony arrived home safely some thirty hours after his journey began.

## II. Legal Proceedings.

The Ettes filed suit against the Linn–Mar Community School District and its superintendent, Joe Pacha, along with Colton and Makinster. Their petition, as finally amended, sought actual and punitive damages for breach of contract, negligent endangerment, defamation, tortious interference with contract and false imprisonment. The defendants asserted a general denial as well as a number of affirmative defenses, among them the discretionary function immunity granted school districts and their employees under Iowa Code section 670.4(3). Plaintiffs eventually dismissed their defamation claim. Defendants unsuccessfully moved for summary judgment. The case proceeded to jury trial. All seem to agree that a claim of intentional infliction of emotional distress was tried by consent.

At the close of all the evidence, the district court sustained the defendants' motion for directed verdict on all plaintiffs' tort claims. The court ruled that the discretionary function exception shielded the school district, as well as the individual defendants, from liability for any negligence surrounding their decision to send Tony home by bus. The court further ruled the evidence was insufficient, as a matter of law, to sustain plaintiffs' claims of false imprisonment, intentional infliction of emotional distress, or tortious interference with contract. It overruled the motion as to plaintiffs' contract claims but limited recoverable damages to the $350 cost of the trip. Thereupon, the plaintiffs moved to dismiss their contract claims without prejudice. The district court granted the motion. This appeal by plaintiffs followed.

## III. Scope of Review.

Our appellate review of the directed verdict for the defendants is limited to the correction of errors at law. *Determan v. Johnson*, 613 N.W.2d 259, 261 (Iowa 2000). The first question is whether the district court correctly interpreted Iowa Code section 670.4(3) and applied it properly to the facts revealed at trial. We must then determine whether the record contained sufficient evidence to submit the plaintiffs' remaining tort claims to the jury. *Id.* In making that decision, we view the evidence in the light most favorable to

the plaintiffs. *Godar v. Edwards*, 588 N.W.2d 701, 705 (Iowa 1999).

### IV. Issues on Appeal.

■ *A. Applicability of the discretionary function exception.* In Iowa, "every municipality is subject to liability for its torts and those of its officers and employees, acting within the scope of their employment or duties, whether arising out of a governmental or proprietary function." Iowa Code § 670.2. By definition, "municipality" includes a school district. *Id.* § 670.1. Municipalities are, however, statutorily immune from liability for "[a]ny claim based upon ... the exercise or performance or the failure to exercise or perform a discretionary function or duty ... whether or not the discretion is abused." *Id.* § 670.4(3). Commonly known as the "discretionary function exception," this immunity is intended to "prevent judicial 'second guessing' of ... administrative decisions grounded in social, economic, and political policy" through tort litigation, thereby protecting municipalities "from liability that would seriously handicap efficient government operations." *Goodman v. City of LeClaire*, 587 N.W.2d 232, 237 (Iowa 1998) (quoting *United States v. Varig Airlines*, 467 U.S. 797, 813–14, 104 S.Ct. 2755, 2764–65, 81 L.Ed.2d 660, 674–75 (1984)).

Because the discretionary function exception has its genesis in the federal tort claims act, we have been guided by federal decisions applying its mandate. *Shelton v. State*, 644 N.W.2d 27, 30 (Iowa 2002). One federal appeals court nicely summarized the analytical framework this way:

> An inquiring court first must identify the conduct that allegedly caused the harm.... The issue, then, is whether this conduct is of the nature and quality that [the government], in crafting the discretionary function exception, sought

to shelter from tort liability. That issue encompasses two questions: Is the conduct itself discretionary? If so, is the discretion susceptible to policy-related judgments?

*Shansky v. United States*, 164 F.3d 688, 690–91 (1st Cir.1999).

Turning to the case before us, the parties disagree from the outset about the nature of the conduct being challenged. The Ettes' petition cast their claim as one for "negligent endangerment," a theory refined by the time of trial to mean no more than breach of the school's duty of ordinary care toward one of its students. *See Godar*, 588 N.W.2d at 708 (schools required to exercise same standard of care toward students as reasonable parent in comparable circumstances). Had their case gone forward, plaintiffs' proposed marshalling instruction would have required them to prove that defendants were "negligent to send Tony Ette from San Antonio, Texas, to Iowa unchaperoned on a Greyhound bus" and such negligence proximately caused their damages. The defendants, on the other hand, see this case falling solely within the realm of school discipline, where decisions are highly discretionary, especially on field trips. *See, e.g., Hassan v. Lubbock Indep. Sch. Dist.*, 55 F.3d 1075, 1080 n. 15 (5th Cir.1995) ("School field trips often present greater, not lesser, challenges to school officials trying to maintain order and discipline than do the relatively orderly confines of a school.").

We resolve this preliminary conflict by observing that the Ettes have never challenged school officials' right to punish Tony for his misbehavior. They merely contend that, in exercising their disciplinary function, the school district and its employees breached their duty of due care for his safety. In other words, the case arose out of a disciplinary situation but

plaintiffs' theory of recovery turns on proof of inadequate supervision and the damages allegedly flowing from that harm.

■■ Having identified the conduct that allegedly caused the plaintiffs' harm, the question becomes whether the conduct is of the type that the legislature sought to immunize. *Shansky,* 164 F.3d at 691. That brings us to the two-part test we recognized in *Goodman:* (1) Did the challenged conduct involve an element of choice or discretion? (2) If discretionary judgment was involved, was the decision or course of action driven by public policy concerns grounded on social, economic or political considerations? *Goodman,* 587 N.W.2d at 237–38; *accord Doe v. Cedar Rapids Cmty. Sch. Dist.,* 652 N.W.2d 439, 443 (Iowa 2002); *City of Cedar Falls v. Cedar Falls Cmty. Sch. Dist.,* 617 N.W.2d 11, 19 (Iowa 2000). A negative answer to either question will defeat the application of the discretionary function exception. *City of Cedar Falls,* 617 N.W.2d at 19. And, because liability is the rule and immunity the exception, the burden rests on the governing body to prove entitlement to the statute's protection. *Doe,* 652 N.W.2d at 446.

■ *Was the conduct discretionary?* Plaintiffs offer a variety of reasons why defendants allegedly fail the first test but—like the district court—we find none of them persuasive. In substance they argue that Colton's and Makinster's decision was ministerial, not discretionary. For example, they assert the decision to send Tony home alone was not a "permissible exercise of judgment" because it violated a number of administrative regulations governing discipline, detention and extracurricular activities. None of these arguments were raised in the trial court, however, so they are not preserved for consideration now. *Kiner v. Reliance Ins. Co.,* 463 N.W.2d 9, 15 (Iowa 1990).

■ Alternatively plaintiffs contend the trip rules themselves dispensed with discretion, either because the contract contemplated return home only for more serious offenses (like weapons or drug use) or because the rules required students to travel only in groups of three or more. We reject these arguments because, as already noted, plaintiffs have reserved their contract claims for another day and the torts they allege here presuppose "wrong choices, not non-choices." *Shelton,* 644 N.W.2d at 30; *accord Messerschmidt v. City of Sioux City,* 654 N.W.2d 879, 882 (Iowa 2002) (city employee's decision to remove road barricade following parade governed not by regulation but by "choice based on judgment"). The rules in fact vested discretion in the trip directors regarding matters of discipline and supervision. And, as will be discussed further, the record is replete with testimony regarding the choices involved in Colton's and Makinster's judgment call. The first test is plainly satisfied.

*Is the discretionary judgment driven by public policy?* The controlling question is whether the defendants' decision to send Tony on an 1100–mile bus trip, alone, was a judgment call driven by social, economic or political concerns. Here is where the important distinction between a school's disciplinary discretion and its supervisory duty comes into play. We entertain no doubt that Colton's swift decision to enforce the no-tobacco rules, rather than giving Tony a second chance, was a decision fraught with social implications. This was the first day of the trip, Tony showed little remorse for his misbehavior, and rumors were flying among the other students regarding the consequences to be imposed. In Colton's words, "if we hadn't acted on it, I'm afraid that we would have had other rules broken, possibly [I] believe more ser-

ious rules, possibly more serious conse- quences." This is just the type of policy- laden disciplinary decision that courts are ill equipped to second-guess and, hence, might enjoy the shield of the discretionary function exception. *See, e.g., Downing v. Brown,* 935 S.W.2d 112, 114 (Tex.1996) (maintaining classroom discipline a discre- tionary function); *Boyett v. Tomberlin,* 678 So.2d 124, 127 (Ala.Civ.App.1996) (teach- er's decision to accept or reject student's reason for leaving classroom "the epitome of a discretionary function"); *Payne v. Twiggs County Sch. Dist.,* 232 Ga.App. 175, 501 S.E.2d 550, 552 (1998) (need to exercise, or refrain from, discipline vested in school officials' discretion).

Moreover we observe that, from an evi- dentiary standpoint, this case is unlike *Doe,* where the school district failed (or, more likely, was unable) to advance com- peting policy considerations driving its de- cision to hire and retain a teacher with a history of pedophilia. *Doe,* 652 N.W.2d at 446. Here the record reveals abundant testimony about the weighing of pros and cons incident to the decision to discipline Tony and, then, to send him home.

■ The weakness in the defendants' position, and the source of error for the district court, is that the challenged con- duct in this case is not the act of discipline but the decision to send a fifteen-year old on a cross-country bus trip unsupervised. That decision, right or wrong, is not one driven by public policy implications uniquely within the purview of school offi- cials and employees. In fact the policy governing such conduct is well settled, as we observed in *Godar:*

> 'The law charges school districts with the care and control of children and requires the school district to exercise the same standard of care toward the children that a parent of ordinary pru-

dence would observe in comparable cir- cumstances.'

*Godar,* 588 N.W.2d at 708 (quoting *Burton v. Metropolitan Transit Auth.,* 530 N.W.2d 696, 699 (Iowa 1995)).

In *City of Cedar Falls,* a case in which the school district claimed the discretion- ary function exception shielded it from lia- bility for the death of a kindergartner on a field trip, we held that "decisions made by a teacher in supervising her class," even when involving matters of judgment, are not of the kind protected by the exception. 617 N.W.2d at 19. So also in *Doe,* we reasoned that the mere existence of gener- alized school district personnel policies did not thereby "catapult" an *individual* hir- ing decision into the "zone" of discretion- ary function immunity, especially where that decision implicated the safety of indi- vidual students. *Doe,* 652 N.W.2d at 445. The reasoning underlying these decisions applies with equal force here. Nearly any professional decision can be ascribed to policy. *Id.* But a school district may not escape its overarching duty of care toward a student in its charge by merely claiming that an individual teacher's decision, such as the one at issue here, was driven by social, economic or political forces and, hence, immune from suit. If that were so, a school district's duty of ordinary care for the safety of its students would be ren- dered a nullity. We are confident this is not what the legislature had in mind when it enacted section 670.4(3).

■ We are mindful, of course, that a school district's duty to supervise its stu- dents and protect them from harm is not unlimited; the law limits the duty to rea- sonably foreseeable risks. *Godar,* 588 N.W.2d at 708. But this weighing of duty and foreseeable risks is a task regularly assumed by courts and juries on a case-by- case basis. Given the record made here, the district court should not have directed

a verdict in defendants' favor based on their alleged entitlement to discretionary function immunity. We therefore reverse that portion of the district court's ruling and remand for a new trial on plaintiffs' negligence claim.

Because the negligence claim must be retried, we need not address plaintiffs' challenge to the verdict directed against them on their punitive damages claim. *See Berding v. Thada*, 243 N.W.2d 857, 862 (Iowa 1976) ("Exemplary damages are not allowed unless actual damages have been established.") On retrial the district court will have to decide, anew, whether the proof tendered by the plaintiffs is sufficient to permit the jury to consider a punitive damages award. *See* Iowa Code § 668A.1 (1999) (prohibiting award of punitive damages unless fact finder determines by clear, satisfactory and convincing proof that defendant acted in "willful and wanton disregard for the rights or safety of another"); *McClure v. Walgreen Co.*, 613 N.W.2d 225, 231 (Iowa 2000) (punitive damages "appropriate only when actual or legal malice is shown").

**B. *Miscellaneous tort claims.*** We need only briefly address plaintiffs' challenge to the dismissal of their claims for alleged intentional torts. As to each count, defendants were entitled to directed verdict because plaintiffs failed to tender substantial evidence on at least one of each claim's essential elements.

 *False imprisonment.* The tort of false imprisonment involves "an unlawful restraint on freedom of movement or personal liberty." *Nelson v. Winnebago Indus., Inc.*, 619 N.W.2d 385, 388 (Iowa 2000). Two essential elements must be proven: "(1) detention or restraint against a person's will, and (2) unlawfulness of the detention or restraint." *Id.* Plaintiffs failed to tender proof on either prong.

Ettes argue on appeal that Tony's "confinement" on the bus constituted "imprisonment" with no reasonable means of escape. The claim simply enjoys no support in the record. The wisdom of the defendants' decision may be debatable under this record, but Tony's response to it is not. He willingly accompanied Colton to the bus station and boarded the bus without objection. The record yields no evidence that Tony put up a fight to stay on the trip or even asked the directors for some other punishment. Under these facts, the claim cannot be sustained. *See* W. Page Keeton, *Prosser & Keeton on Torts* § 11, at 49 (5th ed. 1984) ("[T]he restraint [must] be against the plaintiff's will; and if one agrees of one's own free choice to surrender freedom of motion, as by remaining in a room or accompanying another voluntarily ... then there is no imprisonment."); *Berg v. Norand Corp.*, 169 F.3d 1140, 1147 (8th Cir.1999) (cause of action for false imprisonment requires proof of restraint; proof absent where employer encouraged suicidal employee to seek medical help but employee voluntarily drove to hospital and had herself admitted).

 *Intentional infliction of emotional distress.* To sustain a claim of intentional infliction of emotional distress, plaintiffs must prove four things:

(1) outrageous conduct by the defendant; (2) the defendant's intentional causing, or reckless disregard of the probability of causing emotional distress; (3) the plaintiff has suffered severe or extreme emotional distress; and (4) actual proximate causation of the emotional distress by the defendant's outrageous conduct.

*Taggart v. Drake Univ.*, 549 N.W.2d 796, 802 (Iowa 1996). To qualify as outrageous, the conduct must be "so extreme in degree, as to go beyond all possible bounds

of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Vinson v. Linn–Mar Cmty. Sch. Dist.*, 360 N.W.2d 108, 118 (Iowa 1984) (citation omitted).

Defendants contend on appeal that a jury could find "outrageous" defendants' decision to place a "recently turned 15–year–old" on an 1100–mile bus trip, at midnight, alone. Assuming without deciding that would be so, we nevertheless affirm the court's dismissal of the claim based on plaintiffs' lack of proof on the third element. When asked to describe his feelings about the trip, Tony testified that he was "uncomfortable" as well as "tired and hungry" because the surroundings were "unfamiliar." With some prodding by counsel, he admitted to "being a little scared." The trip seemed to take a greater toll on Robert, who testified the anxiety made him unable to work for three days and troubled him for nearly six months. Neither plaintiff, however, sought medical attention for his alleged distress.

 To sustain this cause of action, plaintiffs "must establish more than the fact that they felt bad for a period of time." *Randa v. U.S. Homes, Inc.*, 325 N.W.2d 905, 908 (Iowa Ct.App.1982). We are convinced, as was the district court, that no reasonable person could describe either plaintiff's injury as "severe or extreme" so as to justify recovery on this ground. *See Millington v. Kuba*, 532 N.W.2d 787, 794 (Iowa 1995). Directed verdict on this count was correctly granted.

*Tortious interference with a contract.* With rare exceptions not pertinent here, the tort of malicious interference with a contract "can only be committed by a third party, not a party to [the] contract." *Harbit v. Voss Petroleum, Inc.*, 553 N.W.2d 329, 331 (Iowa 1996). Colton,

Makinster and Pacha were all employees of the school district. In the absence of any proof that their decisions were motivated predominantly by an intent to cause injury to the Ettes, the district court rightly directed a verdict in their favor on this tort claim. *See Berger v. Cas' Feed Store, Inc.*, 543 N.W.2d 597, 599 (Iowa 1996) (court erred in directing verdict where record contained "no evidence of predominant purpose of causing injury to the plaintiffs" in dispute over contract).

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**