Terry HARRINGTON, Plaintiff,

v.

Matthew D. WILBER and
Pottawattamie County,
Iowa, Defendants.

No. 4:03–CV–90616.

United States District Court,
S.D. Iowa,
Central Division.

Jan. 27, 2005.

Larissa A. Ferullo, Spence Shockey & McCalla, Jackson, WY, Thomas P. Frerichs, Frerichs Law Office PC, Waterloo, J. Douglas McCalla, Spence Shockey & McCalla, Gerry L. Spence, Spence Shockey & McCalla, Jackson, WY, Brandon Adams, Adams Law Offices, Waterloo, IA, for Terry J. Harrington, Plaintiff.

Kristopher K. Madsen, Stuart Tinley Peters Thorn Hughes Faust & Madsen, Council Bluffs, IA, for Pottawattamie County, Iowa, Matthew D. Wilber, Defendants.

## MEMORANDUM OPINION AND ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

PRATT, District Judge.

Before the Court is Defendants' Motion for Summary Judgment (Clerk's No. 14). Plaintiff Terry Harrington ("Harrington") filed a resistance to the motion and Defendant replied. The matter is fully submitted.

### I. PROCEDURAL BACKGROUND

Plaintiff filed his first amended and substituted Complaint on November 13, 2003, alleging libel and slander against Defendants Matthew D. Wilber ("Wilber") and Pottawattamie County, Iowa ("Pottawattamie County"). Plaintiff is a resident and citizen of the State of Nebraska. Defendant Wilber is a resident and citizen of Pottawattamie County, Iowa. Defendant Pottawattamie County is a county within the State of Iowa. Plaintiff alleges dam-

ages in an amount exceeding $75,000.00. Thus, jurisdiction is proper pursuant to 28 U.S.C. § 1332, diversity jurisdiction.

## II. FACTUAL BACKGROUND

In July 1977, the body of John Schweer ("Schweer"), a night watchman for a Council Bluffs automobile dealer, was found. Schweer had apparently been shot to death. On August 4, 1978, then eighteen-year-old Terry Harrington was convicted by a jury of his peers of the First Degree Murder of Schweer. Harrington maintained throughout his trial that he was at a music concert at the time Schweer was shot. Nonetheless, in light of the jury verdict finding him guilty, Harrington was sentenced to a term of life imprisonment, the required sentence under Iowa law. After serving approximately twenty-five years of his life sentence, the Iowa Supreme Court reversed Harrington's conviction, finding the prosecutor had committed a *Brady* violation by failing to disclose police reports identifying an alternative suspect. *See Harrington v. Iowa,* 659 N.W.2d 509 (Iowa 2003) (citing *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963)). The case was remanded to the trial court for a new trial. *Id.*

Just prior to the Iowa Supreme Court's decision, in November 2002, Wilber was elected Pottawattamie County Attorney. Wilber took office on January 2, 2003. As a result of the press coverage of the matter, Harrington moved for a change of venue, alleging that he would "not be able to receive a fair trial in Pottawattamie County" due to the "high profile nature" of the case. Def.'s App. at 133. After the Iowa Supreme Court remanded the case for new trial, Wilber began conducting a renewed investigation into the murder of John Schweer. Based on his investigation, Wilber moved the Iowa District Court to dismiss the criminal case against Harrington, noting that there was insufficient ad-

missible evidence to support a conviction due to the age of the case, and because important prosecution witnesses had recanted their prior testimony. *Id.* at 20. The motion was granted on October 24, 2003, and the charges against Harrington were dismissed without prejudice. *Id.* at 20–21.

Shortly after the district court granted the dismissal motion, Wilber issued a press release and held a press conference, announcing the dismissal of charges against Harrington. The press release read as follows:

It is with regret that I am announcing my decision to discontinue the prosecution against Terry Harrington for the murder of John Schweer. Recent events have unfortunately made it impossible for us to proceed with the trial. As you are all undoubtedly aware, I am very limited on the information I can convey outside of an official court document or proceeding. I can tell you that I have filed a very detailed application to dismiss this case and that Chief Judge Charles Smith granted that application a short while ago. It is important to note that this dismissal is considered to be "without prejudice," which basically means that should additional evidence come to light, or should evidence which is currently not admissible become admissible, our office could refile the charge of First Degree Murder against Mr. Harrington.

I met with the children of John Schweer for about two hours this morning. They have asked me to let you know that they may be issuing a statement through a family representative but would prefer that they not be contacted directly by the media. They did ask me to let you know that, while disappointed in the outcome, they are sup-

portive of the decision to discontinue the prosecution of this case at this time.

The interesting irony of this case is that Terry Harrington was put in prison by his own friends and associates. If they are now choosing to change their sworn testimony there is little I can do to stop that. We play the cards we are dealt as best we can. In this case, there were multiple witnesses who changed their testimony from what was given in 1978, including the recent recantation of Kevin Hughes during his deposition yesterday morning.

I want to thank Detective Dave Dawson (and the rest of the Council Bluffs Police Department for that matter) for his dedication to this case. Detective Dawson was able to track down over 71 of our 82 witnesses and the 11 he couldn't track down actually passed away during some point over the past twenty-six years. Detective Dawson did a fantastic job organizing this case after it sat in our closed files for over twenty-five years.

*After personally spending hundreds of hours on this case, I have no doubt that Terry Harrington committed the murder of John Schweer on July 22, 1977. The jury made the right decision in 1978, and the right man went to prison for over twenty-five years.* That said, I also have no doubt that the admissible evidence which is left after twenty-six years is not sufficient to sustain a conviction against Mr. Harrington.

The easy decision on this case would have been to let it drop when the Supreme Court granted Mr. Harrington a new trial earlier this year. I certainly had many people recommend that I take that easier path. That would not have been the right decision, however. *I owed it to the family of John Schweer to do my best on this case to bring his killer to justice a second time.* And

while I am disappointed that I will not get the opportunity to put this case before a jury, I am satisfied that nothing else could have been done, by my office or by the Council Bluffs Police Department. *As for final justice for Terry Harrington, I will defer that honor to a higher power.*

On a related note, Curtis McGhee, a co-defendant of Mr. Harrington's in this case, pleaded no contest today to a charge of Second Degree Murder for the death of John Schweer. Mr. McGhee was sentenced to a term of imprisonment of twenty-five years. Since Curtis McGhee had already served more than twenty-five years in prison since his original conviction in 1978, he was credited with time served and left the courthouse late this morning. Even though Mr. McGhee did not actually pull the trigger on the gun that killed John Schweer, our case against him was stronger than against Terry Harrington. Mr. McGhee had made admissions to at least three different people about being with Terry Harrington when Harrington shot a police officer in Council Bluffs. Those statements would likely not be admissible in a trial against Terry Harrington, but would certainly have come into evidence at a trial against Mr. McGhee. Mr. McGhee was offered a chance to plead to Second Degree Murder back in 1978 and, had he taken that deal back then, he would probably have been paroled over ten years ago.

Matt Wilber, Pottawattamie County Attorney

Def.'s App. at 147–49 (emphasis added).

Harrington claims that the italicized portions of Wilber's press release constitute libel per se. Moreover, Plaintiff claims that, at a press conference on the same date, Wilber orally defamed him by repeating and enlarging on the printed

statements, constituting slander per se. Plaintiff, therefore, requests damages for defamation to his name and reputation, and for emotional distress. Moreover, Plaintiff argues that Wilber's actions were done willfully and with malice, thus entitling Plaintiff to punitive damages. Plaintiff raises the same allegations against Pottawattamie County, as he claims Wilber's actions were taken in the course of his employment with the County.

Defendants filed the present motion for summary judgment on August 16, 2004. Defendants claims that Plaintiff's case should be dismissed because: 1) Wilber's statements are protected as First Amendment opinion; 2) Wilber's statements are protected by an absolute privilege because they were incidental to the termination of a judicial proceeding; 3) Wilber's statements are protected by qualified privilege; 4) Wilber's statements were discretionary acts immune from liability under the Iowa Municipal Tort Claims Act, Iowa Code § 670 et seq.; and 5) Plaintiff's claim for punitive damages fails as a matter of law under the Iowa Municipal Tort Claims Act.

### III. STANDARD FOR SUMMARY JUDGMENT

Summary judgment has a special place in civil litigation. The device "has proven its usefulness as a means of avoiding full-dress trials in unwinnable cases, thereby freeing courts to utilize scarce judicial resources in more beneficial ways." *Mesnick v. General Elec. Co.*, 950 F.2d 816, 822 (1st Cir.1991). In operation, the role of summary judgment is to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required. *See id.; see also Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir.1990).

"[S]ummary judgment is an extreme remedy, and one which is not to be granted unless the movant has established his right to a judgment with such clarity as to leave no room for controversy and that the other party is not entitled to recover under any discernible circumstances." *Robert Johnson Grain Co. v. Chemical Interchange Co.*, 541 F.2d 207, 209 (8th Cir. 1976) (citing *Windsor v. Bethesda Gen. Hosp.*, 523 F.2d 891, 893 n. 5 (8th Cir. 1975)). The purpose of the rule is not "to cut litigants off from their right of trial by jury if they really have issues to try," *Poller v. Columbia Broad. Sys., Inc.*, 368 U.S. 464, 467, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962) (quoting *Sartor v. Arkansas Natural Gas Corp.*, 321 U.S. 620, 627, 64 S.Ct. 724, 88 L.Ed. 967 (1944)), but to avoid "useless, expensive and time-consuming trials where there is actually no genuine, factual issue remaining to be tried," *Anderson v. Viking Pump Div., Houdaille Indus., Inc.*, 545 F.2d 1127, 1129 (8th Cir. 1976) (citing *Lyons v. Board of Educ.*, 523 F.2d 340, 347 (8th Cir.1975)).

The plain language of Federal Rule of Civil Procedure 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The precise standard for granting summary judgment is well-established and oft-repeated: summary judgment is properly granted when the record, viewed in the light most favorable to the nonmoving party and giving that party the benefit of all reasonable inferences, shows that there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Harlston v. McDonnell Douglas Corp.*, 37 F.3d 379, 382 (8th Cir.1994). The court does not weigh the evidence nor make credibility

determinations, rather the court only determines whether there are any disputed issues and, if so, whether those issues are both genuine and material. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Wilson v. Myers,* 823 F.2d 253, 256 (8th Cir.1987) ("Summary judgment is not designed to weed out dubious claims, but to eliminate those claims with no basis in material fact.") (citing *Weight Watchers of Quebec, Ltd. v. Weight Watchers Int'l, Inc.,* 398 F.Supp. 1047, 1055 (E.D.N.Y. 1975)).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact based on the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any. *See Celotex,* 477 U.S. at 323, 106 S.Ct. 2548; *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. Once the moving party has carried its burden, the nonmoving party must go beyond the pleadings and, by affidavits or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is genuine issue for trial. *See* Fed. R.Civ.P. 5(c), (e); *Celotex Corp.,* 477 U.S. at 322–23, 106 S.Ct. 2548; *Anderson,* 477 U.S. at 257, 106 S.Ct. 2505. "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat a motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson,* 477 U.S. at 247–48, 106 S.Ct. 2505. An issue is "genuine," if the evidence is sufficient to persuade a reasonable jury to return a verdict for the nonmoving party. *See id.* at 248, 106 S.Ct. 2505. "As to materiality, the substantive law will identify which facts are material .... Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

## IV. LAW AND ANALYSIS

"Defamation includes the twin torts of libel and slander." *Kiesau v. Bantz,* 686 N.W.2d 164, 174 (Iowa 2004) (citing *Theisen v. Covenant Med. Ctr., Inc.,* 636 N.W.2d 74, 83 (Iowa 2001)). "Libel involves written statements, while slander involves oral statements." *Id.* (citing *Johnson v. Nickerson,* 542 N.W.2d 506, 510 (Iowa 1996)). More specifically: "Libel in Iowa is the 'malicious publication, expressed either in printing or in writing, or by signs and pictures, tending to injure the reputation of another person or to expose [the person] to public hatred, contempt, or ridicule or to injure [the person] in the maintenance of [the person's] business.'" *Vinson v. Linn–Mar Community Sch. Dist.,* 360 N.W.2d 108, 115 (Iowa 1984) (quoting *Plendl v. Beuttler,* 253 Iowa 259, 111 N.W.2d 669, 670–71 (1961)). Slander's definition is nearly identical to that of libel, however, the injurious words are conveyed by oral statements. *Id.*

■ Certain statements may qualify as being libelous or slanderous per se. This means:

> [The statements] are actionable in and of themselves without proof of malice, falsity or damage. In actions based on language not libelous per se, all of these elements must be proved ... before recovery can be had, but when a statement is libelous [or slanderous] per se they are presumed from the nature of the language used.

*Id.* at 115–16 (quoting *Vojak v. Jensen,* 161 N.W.2d 100, 104 (Iowa 1968)). To determine if words are libelous or slanderous per se, the Court must evaluate whether the words "are of such a nature, whether true or not," that it can be presumed as a matter of law that their publication or conveyance will have a libelous or slanderous effect. *Id.* at 116 (quoting *Haas v.*

*Evening Democrat Co.*, 252 Iowa 517, 107 N.W.2d 444, 447 (1961)).

Plaintiff here cites three specific portions of Wilber's press release and oral presentation thereof, that constitute defamation. The first allegedly defamatory statement is: "After personally spending hundreds of hours on this case, I have no doubt that Terry Harrington committed the murder of John Schweer on July 22, 1977. The jury made the right decision in 1978, and the right man went to prison for over twenty-five years." Def's App. at 147–49. The second allegedly defamatory statement is: "I owed it to the family of John Schweer to do my best on this case to bring his killer to justice a second time." *Id.* The third and final allegedly defamatory statement is: "As for final justice for Terry Harrington, I will defer that honor to a higher power." *Id.* Plaintiff claims that each of these statements constitutes defamation per se. Notably, Defendants appear to admit that, should the Court find these statements defamatory, the first two are defamatory per se: "Defendants dispute whether the [third] comment is even per se defamatory." Def.'s Br. In Support of Summ. J. at 6.

"An attack on the integrity and moral character of a party is [defamatory] per se." *Vinson*, 360 N.W.2d at 116 (citing *Shaw Cleaners & Dyers v. Des Moines Dress Club*, 215 Iowa 1130, 245 N.W. 231, 234 (1932)). "[W]hen the language of the publication is unambiguous, the issue of whether the publication is defamatory per se is for the court." *Id.* at 116. Here, the Court finds that, at least with regard to the first two allegedly defamatory portions of Wilber's press release, the statements are per se defamatory. It has long been accepted that accusing a person of being a liar constitutes defamation per se. *See, e.g., Prewitt v. Wilson*, 128 Iowa 198, 103 N.W. 365, 367 (1905) (a written publication stating that the subscribers were well ac-

quainted with plaintiff and would not believe him under oath found libelous per se). Here, the first two statements specifically accuse Harrington of being a murderer. These comments were clearly directed at Harrington, and could reasonably be understood to impugn his "integrity or moral character," "expose [him] to public hatred, contempt or ridicule," "deprive [him] of the benefits of public confidence and social dealings," or "injure [him] in the maintenance of his business." *See Vinson*, 360 N.W.2d at 116.

While the third statement, standing alone, is not readily identifiable as defamation per se, it is well settled that when a question arises concerning whether a defamation per se claim should be submitted to the jury, the court "need only decide whether the statement could reasonably be understood as [defamation] per se." *Wilson v. IBP, Inc.*, 558 N.W.2d 132, 140 (Iowa 1996) (citing *Vinson*, 360 N.W.2d at 116); *see also Kelly v. Iowa State Educ. Ass'n*, 372 N.W.2d 288, 295 (Iowa Ct.App.1985) (rejecting, based on Iowa case law, defendants' argument that "writings cannot be libelous per se because no derogatory meaning is present in the statements themselves [and that] such meaning only arises by inference"). The determinative rule is: "If the language is capable of two meanings including the one ascribed by the complainant, it is for the jury to say whether such meaning was the one conveyed." *Vinson*, 360 N.W.2d at 116 (citing *Berger v. Freeman Tribune Publ. Co.*, 132 Iowa 290, 109 N.W. 784, 786 (1906)). Thus, in the present case, there is sufficient basis to conclude that a jury should properly make the determination as to whether the third statement constitutes defamation per se. *See id.* (citing *Shaw Cleaners*, 245 N.W. at 233 for the proposition that "words which are defamatory per se do not need an innuendo, and words

which need an innuendo are not defamatory per se.").

There can be little doubt on the present facts, viewed in the light most favorable to the non-moving party, that Harrington has raised a genuine issue of material fact that all of the italicized statements of Wilber are libelous or slanderous per se. Moreover, the question of whether the statements were truthful is sufficiently debatable to give rise to a jury question. *See Jones v. Palmer Communications, Inc.,* 440 N.W.2d 884, 891 (Iowa 1989) (noting that substantial truth is an absolute defense in a defamation action); *but see Kelly,* 372 N.W.2d at 295 (the truth or falsity of a statement does not affect the determination whether the statement is libelous per se). The Court now turns to Defendants' arguments in favor of summary judgment on issues of absolute defenses.

### A. *Statements of Opinion*

■■■ Assuming then, for purposes of summary judgment, that Wilber's statements about Plaintiff are defamation per se, summary judgment would still be appropriate upon a finding that the statements constitute opinion. "Opinion is absolutely protected under the First Amendment." *Jones,* 440 N.W.2d at 891. Iowa courts have adopted various factors to determine whether a statement is fact or opinion. *Id.* These are: 1) the precision and specificity of the statement; 2) the verifiability of the statement; and 3) the literary context in which the statement was made. *Id.* "Related to the literary context of the disputed statement is the 'social context,' which 'focuses on the category of publication, its style of writing and intended audience.'" *Id.* at 891–92 (citing *Janklow v. Newsweek, Inc.,* 788 F.2d 1300, 1303 (8th Cir.1986)). Also to be considered are the " 'public context' or political arena in which the statements were made." *Id.* at 892 (citing *Janklow,* 788 F.2d at 1303; *Ollman v. Evans,* 750

F.2d 970, 1002–05 (D.C.Cir.1984) (Bork, Wilkey, Ginsburg, & MacKinnon, JJ., concurring)). "In considering these factors, the statement must be taken as part of a whole, including the tone of the broadcast and the use of cautionary language." *Id.* (citing *Janklow,* 788 F.2d at 1302).

Applying these factors to the three italicized portions of Wilber's statements, the Court first finds that the statements, particularly the first two, are reasonably specific and precise. Wilber stated specifically that, "I have no doubt that Terry Harrington committed the murder of John Schweer," "the right man went to prison for over twenty-five years," and that he owed it to the victim's family "to bring his killer to justice a second time." These statements very clearly state that Plaintiff is a murderer. A concept related to specificity and precision is verifiability. *Jones,* 440 N.W.2d at 891 (citing *Janklow,* 788 F.2d at 1302). Thus, "if a statement is precise and easy to verify, it is likely the statement is fact." *Id.* Defendants contend that a retrial of the murder case against the Plaintiff would likely be necessary to verify Wilber's comments as fact, thus making Wilber's statements virtually unverifiable and more likely opinion.

■■■ This does not end the inquiry, however, because the mere fact that a statement is difficult to verify does not definitively require a finding that the statement is one of pure opinion. "If the defendant expresses a derogatory opinion without disclosing the facts on which it is based, he is subject to liability if the comment creates the reasonable inference that the opinion is justified by the existence of unexpressed defamatory facts." Restatement (Second) of Torts § 566 (2004). In *Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990), the Supreme Court rejected the bright-line

rule, previously adopted by courts, that any statement of opinion was necessarily protected by the First Amendment. *Id.* The Supreme Court found the dichotomy too simplistic and stated that it never intended "to create a wholesale defamation exemption for anything that might be labeled 'opinion.'" *Milkovich,* 497 U.S. at 18, 110 S.Ct. 2695. The Court concluded that, "[s]imply couching such statements in terms of opinion does not dispel [the false, defamatory] implications" because a speaker may still imply "a knowledge of facts which lead to the [defamatory] conclusion." *Id.* Thus, while "pure" opinions are wholly protected by the First Amendment, a statement that "may ... imply a false assertion of fact" is actionable. *Id.* at 19, 110 S.Ct. 2695.

Accordingly, in determining whether Wilber's statement was one of constitutionally protected First Amendment opinion, the Court must determine "whether a reasonable fact finder could conclude that the contested statements 'impl[y] an assertion of objective fact.'" *Unelko Corp. v. Rooney,* 912 F.2d 1049, 1053 (9th Cir.1990) (quoting *Milkovich,* 497 U.S. at 18, 110 S.Ct. 2695). The Ninth Circuit has adopted a three-part test to make this determination: (1) whether the general tenor of the entire work negates the impression that the defendant was asserting an objective fact, (2) whether the defendant used figurative or hyperbolic language that negates that impression, and (3) whether the statement in question is susceptible of being proved true or false. *Id.* In the present case, the entire press release was aimed at explaining to the public why the charges against Plaintiff were dismissed. Wilber explained that the same friends of Plaintiff who put him in prison in 1978 were now changing their stories and that Wilber could do nothing to prevent such actions. Wilber indicated that he had spent "hundreds of hours" investigating the case and was certain that

Plaintiff killed John Schweer in 1977. Wilber went on to state that after twenty-six years, there was not enough "admissible evidence" left to sustain a conviction.

Evaluating Wilber's language in context, the Court believes that a reasonable mind could find that the reference to an insufficiency of "admissible evidence" indicates that Wilber's hundreds of hours of investigation revealed facts to him supporting his certainty that Plaintiff is a murderer. *See Masson v. New Yorker Magazine,* 501 U.S. 496, 520, 111 S.Ct. 2419, 115 L.Ed.2d 447 (1991); *Milkovich,* 497 U.S. at 19, 110 S.Ct. 2695 (each emphasizing that statements must be analyzed in broad context to determine whether there is an implication of objective facts). Such facts are not disclosed in the press release, nor were they disclosed in the oral press conference. The Court can see no hyperbolic or figurative language negating this impression. Finally, the statement that Plaintiff killed John Schweer is susceptible to being proved true or false, despite the difficulty that may be raised in doing so.

> [A]n opinion which is unfounded reveals its lack of merit when the opinion-holder discloses the factual basis for the idea. If the disclosed facts are true and the opinion is defamatory, a listener may choose to accept or reject it on the basis of an independent evaluation of the facts. However, if an opinion is stated in a manner that implies that it draws upon unstated facts for its basis, the listener is unable to make an evaluation of the soundness of the opinion.

*Redco Corp. v. CBS, Inc.,* 758 F.2d 970, 972 (3d Cir.1985).

In this case, despite the context of the statements, the audience, the purpose for the statements, and the difficulty in verifying them, reasonable minds could find that the statements imply a knowledge by Wilber of information, unknown to the public,

that supports the statements. As such, the determination of whether Wilber's statements are defensible as opinion should be left to a jury. Summary judgment is inappropriate.

### B. *Incidental to Termination of Judicial Proceeding*

Defendants next argue that Wilber's statements are absolutely protected in the defamation context because the statements were made incidental to the termination of a judicial proceeding, thus requiring the application of the prosecutorial immunity privilege. Defendants cite *Buckley v. Fitzsimmons* in support of this proposition. *See Buckley v. Fitzsimmons,* 509 U.S. 259, 261, 113 S.Ct. 2606, 125 L.Ed.2d 209 (1993). In *Buckley,* the Court was faced with determining whether a prosecutor was absolutely immune from liability on claims of fabricating evidence during the preliminary investigation of a crime, and for making false statements at a press conference announcing the return of an indictment in relation to the murder of an eleven year-old girl. *Id.* at 261, 113 S.Ct. 2606. Preliminarily, the Supreme Court recognized that 18 U.S.C. section 1983 provides qualified immunity for public officials, such that those officials will not be subject to liability "for the performance of their discretionary functions when 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Id.* at 268, 113 S.Ct. 2606 (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)).

The Court went on to recognize, however, that certain officials who perform "special functions" are entitled to absolute immunity for those functions, though the burden is upon the official seeking absolute immunity to show that "such immunity is justified for the function in question." *Id.* at 269, 113 S.Ct. 2606 (quoting *Burns v. Reed,* 500 U.S. 478, 486, 111 S.Ct. 1934,

114 L.Ed.2d 547 (1991)). The Court recognized that there exists a rule of absolute immunity for conduct of prosecutors for conduct "intimately associated with the judicial phase of the criminal process." *Id.* at 270, 113 S.Ct. 2606 (citing *Imbler v. Pachtman,* 424 U.S. 409, 424, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976)). Thus, a prosecutor is absolutely immune from liability "in initiating a prosecution and in presenting the State's case." *Id.* at 270, 113 S.Ct. 2606 (citing *Imbler,* 424 U.S. at 431, 96 S.Ct. 984).

With regard to the defamation allegation against the *Buckley* prosecutor, wherein the prosecutor allegedly made false and prejudicial statements against the suspect, the Supreme Court found that the statements were not entitled to absolute immunity: "Comments to the media have no functional tie to the judicial process just because they are made by a prosecutor. At the press conference, [the prosecutor] did not act in 'his role as advocate for the State.' " *Id.* at 278, 113 S.Ct. 2606 (quoting *Burns,* 500 U.S. at 491, 111 S.Ct. 1934). "The conduct of a press conference does not involve the initiation of a prosecution, the presentation of the state's case in court, or actions preparatory for these functions. Statements to the press may be an integral part of a prosecutor's job . . . and they may serve a vital public function. But in these respects a prosecutor is in no different position than other executive officials who deal with the press, and . . . qualified immunity is the norm for them." *Id.* at 278.

Defendants attempt to distinguish the *Buckley* case from the case at bar by stating that, in *Buckley,* the prosecutor's allegedly defamatory comments "were made early, before trial, when the statements could have an impact on the criminal process." Def.'s Br. in Support of Summ. J. at 8–9. "In this case, Mr. Wil-

ber's allegedly defamatory statements were made after and *incidental to* the proper termination of the criminal proceedings." *Id.* at 9. Indeed, Defendants quote *Buckley* as holding "that absolute immunity does not apply to the publication of defamatory statements 'before the commencement, or after their termination of the judicial proceedings (unless such publication is an act incidental to the proper initiation thereof, or giving legal effect thereto) ....'" *Id.* at 8 (quoting *Buckley,* 509 U.S. at 277, 113 S.Ct. 2606). Defendants' interpretation of *Buckley* is unpersuasive.

 The plain language of *Buckley* holds that prosecutorial press conferences, though perhaps necessary, are not entitled to absolute immunity. Indeed, while the press conference here at issue may have served a valuable public service, it was not incidental to any proceeding in the manner intended by the absolute immunity privilege. Such privilege is meant only to prevent the hampering of job performance by prosecutors due to fear of liability, and is meant only to apply "fairly within [the prosecutor's] function as an advocate." *Id.* at 273, 113 S.Ct. 2606. "A prosecutor's administrative duties and those investigatory functions that relate to an advocate's preparation ... for judicial proceedings are not entitled to absolute immunity." *Id.* The Court finds that Wilber's press conference statements were clearly part of an administrative duty, and not incidental to the performance of his duties as an advocate. Thus, the statements are not entitled to absolute immunity and summary judgment is unwarranted.

### C. *Qualified Privilege*

 Defendants next assert that Wilber's statements are protected by qualified privilege. Certain privileges are afforded defendants by law "because '[s]ometimes one is justified in communi-

cating to others, without liability, defamatory information .... The law recognizes certain situations may arise in which a person, in order to protect his own interests or the interests of others, must make statements about another which are indeed libelous.'" *Barreca v. Nickolas,* 683 N.W.2d 111, 117 (Iowa 2004) (quoting *Vojak v. Jensen,* 161 N.W.2d 100, 105 (Iowa 1968)). "'When this happens, the statement is said to be privileged, which simply means no liability attaches to its publication.'" *Id.* (quoting *Vojak,* 161 N.W.2d at 105). The Iowa Supreme Court set forth the elements of qualified privilege in *Vojak v. Jensen:*

A communication made in good faith on any subject matter in which the person communicating has an interest, or in reference to which he has a duty, is privileged if made to a person having a corresponding interest or duty, even though it contains matter which, without this privilege, would be actionable and although the duty is not a legal one ....

The essential elements of a conditionally privileged communication may accordingly be enumerated as good faith, an interest to be upheld, a statement limited in its scope to this purpose, a proper occasion, and publication in a proper manner and to proper parties only. The (qualified) privilege arises from the necessity of full and unrestricted communication concerning a matter in which the parties have an interest or duty, and is not restricted within narrow limits.

In the absence of malice an utterance may be qualifiedly privileged, even though it is not true .... But the mere color of lawful occasion and pretense of justifiable end cannot shield from liability a person who publishes and circulates defamatory matter. Hence a publication

loses its character as privileged, and is actionable, on proof of actual malice.

*Vojak,* 161 N.W.2d at 105 (citing 33 Am. Jur., *Libel and Slander,* § 126). In essence, then, "qualified privilege renders nonactionable statements which would otherwise subject one to liability." *Id.*

 The press conference held by Wilber appears to be of such a character that the attachment of qualified privilege is appropriate. As the Supreme Court noted in *Buckley,* comments by a prosecutor at a press conference may serve a vital public function. *Buckley,* 509 U.S. at 259, 113 S.Ct. 2606. "A qualified privilege may attach to certain statements made by a lower-ranking government official which are necessary to the performance of official duties." *Jones,* 440 N.W.2d at 892 (citing *Brown v. First Nat'l Bank,* 193 N.W.2d 547, 552–53 (1972)). "It is for the court to decide as a matter of law whether the qualified privilege is available for a particular statement." *Id.* at 892 (citing *Brown,* 193 N.W.2d at 552).

 The qualified privilege for otherwise defamatory communications will only apply if: "(1) the statement was made in good faith; (2) the defendant had an interest to uphold; (3) the scope of the statement was limited to the identified interest; and (4) the statement was published on a proper occasion, in a proper manner, and to proper parties only." *Barreca,* 683 N.W.2d at 121 (citing *Winckel v. Von Maur, Inc.,* 652 N.W.2d 453, 458 (Iowa 2002)). On the present facts, and viewing the entire context of Mr. Wilber's statement, it appears that the press release was, at least initially, motivated by good faith. Moreover, Wilber had an interest to inform the public why he would not be pursuing further charges against the Plaintiff and his statement, generally, was targeted toward that interest. Thus, as a whole, the statement constituted an attempt, in a reasonably diplomatic and coordinated manner, to inform the public about a matter that, by virtue of the extensive press coverage, was one of public concern. Accordingly, the qualified privilege is applicable.

 Nonetheless, "[a] qualified privilege is a defeasible immunity from liability; that is, a qualified privilege may be defeated under certain circumstances." *Barreca,* 683 N.W.2d at 116. Such circumstances may arise when the privilege is abused or if the defamatory remarks were made with actual malice. The Iowa Supreme Court has recently adopted the *New York Times* test to determine whether actual malice defeats a claim of qualified immunity. *See New York Times v. Sullivan,* 376 U.S. 254, 279–80, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). The *New York Times* test "focuses upon whether the defendant published the statement with a knowing or reckless disregard of its truth." *Ballantine v. Olson,* —— N.W.2d ——, 2004 WL 2578958, at *3 (Iowa App.2004) (citing *Barreca,* 683 N.W.2d at 123).

In this case, there is ample evidence from which a jury could conclude that Wilber acted with a knowing or reckless disregard for the truth when he stated that Plaintiff murdered Schweer. Plaintiff's Statement of Additional Undisputed Material Facts, the majority of which are admitted by Defendants, indicates a substantial amount of evidence which could support a conclusion that Wilber's statements recklessly disregarded the very real possibility that Harrington is not guilty of the murder of John Schweer. Specifically, Wilber appears to base his opinion of Harrington's guilt primarily on the 1978 testimony of Kevin Hughes, a witness who made numerous contradictory statements regarding who was involved in Schweer's murder, and who has now recanted his allegation that Harrington was the shooter. Moreover, Wilber discredits the testimony of

Harrington's alibi witnesses, the possibility of another suspect, and the possibility that witnesses who have recanted since 1978 are today telling the truth. These issues are more than ample to raise a genuine issue of material fact as to whether Wilber acted with actual malice in his allegation that Harrington murdered John Schweer.

### D. *Discretionary Acts Immune From Liability under Iowa Municipal Tort Claims Act*

■ Defendants next contend that Wilber's statements are shielded from liability pursuant to Iowa Code Chapter 670, commonly referred to as the Iowa Municipal Tort Claims Act ("IMTCA"). In Iowa, "every municipality is subject to liability for its torts and those of its officers and employees, acting within the scope of their employment or duties, whether arising out of a governmental or proprietary function." Iowa Code § 670.2. By definition, "municipality" includes a county. *Id.* § 670.1. Municipalities are, however, statutorily immune from liability for "[a]ny claim based upon ... the exercise or performance or the failure to exercise or perform a discretionary function or duty ... whether or not the discretion is abused." *Id.* § 670.4(3).

■ This "discretionary function exception" is intended to "prevent judicial 'second guessing' of ... administrative decisions grounded in social, economic, and political policy" through tort litigation, thereby protecting municipalities "from liability that would seriously handicap efficient government operations." *Ette v. Linn–Mar Community Sch. Dist.*, 656 N.W.2d 62, 68 (Iowa 2002) (quoting *Goodman v. City of LeClaire*, 587 N.W.2d 232, 237 (Iowa 1998); *United States v. Varig Airlines*, 467 U.S. 797, 813–14, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984)).

The Iowa Supreme Court analyzes whether the discretionary function exception applies in the following way:

We apply a two-step analysis to each specification of negligence to determine whether the ... challenged actions fall within the discretionary function exemption, inquiring (1) whether the action in question was a matter of judgment or choice for the acting employee and (2) whether, if an element of judgment is involved in the challenged conduct, the judgment is of a kind that the discretionary function exception was designed to shield. *Goodman v. City of Le Claire*, 587 N.W.2d 232, 237–38 (Iowa 1998) (citing *Berkovitz v. United States*, 486 U.S. 531, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988)). If the answer to either question is "no," the discretionary function exemption does not apply.

*City of Cedar Falls v. Cedar Falls Community Sch. Dist.*, 617 N.W.2d 11, 19 (Iowa 2000). A "discretionary function" generally involves the evaluation of broad policy factors such as the financial, political, economic, and social effects of a given plan or policy. *See Keystone Elec. Mfg., Co. v. City of Des Moines*, 586 N.W.2d 340, 347 (Iowa 1998).

■ Clearly, the decision of whether or not to hold a press conference advising the public about the status of a high-profile case is a discretionary decision. Such discretion is generally afforded to public officials, such as county attorneys, as part of the administrative duties incidental to the position. Nonetheless, to qualify for immunity from liability, Wilber's actions must also meet the second portion of the test, that is, the Court must determine whether the challenged conduct, *i.e.*, Wilber's allegedly defamatory statements, are of a kind the discretionary function was intended to shield. *City of Cedar Falls*, 617 N.W.2d at 19. "[B]ecause liability is the rule and immunity the exception, the burden rests on the governing body to

prove entitlement to the statute's protection." *Ette*, 656 N.W.2d at 68.

Accordingly, the Court now turns to the second prong of the test, that is, whether the challenged conduct is of the nature the legislature intended to shield from liability. *See Goodman*, 587 N.W.2d at 236–38. In making this determination, the Court must examine whether the "challenged action was 'grounded in social, economic, and political policy.'" *City of Cedar Falls*, 617 N.W.2d at 19 (quoting *Berkovitz*, 486 U.S. at 536, 108 S.Ct. 1954). The more the Defendants' judgment involved policy making, "the more it is recognized as immune from judicial process." *Doe v. Cedar Rapids Community Sch. Dist.*, 652 N.W.2d 439, 2002 WL 2022486 at *4 (Iowa 2002). The controlling question, then is "whether the defendants' decision [to comment on the guilt or innocence of Plaintiff] was a judgment call driven by social, economic or political concerns." *Ette*, 656 N.W.2d at 68. The Court finds it was not.

Defendants argue that Wilber's "conduct could be based on a policy justification weighing competing ideals to promote the paramount concerns, insuring justice and informing the public, over the less essential and opposing values, such [as] Mr. Wilber's individual interest or a potential civil suit."[1] Def.'s Br. in Support of Summ. J. at 18. In determining whether social, economic or political concerns motivated Wilber's decision to make the allegedly defamatory comments about Plaintiff, the Court does "not consider the subjective intent of the person making the governmental decision as it is irrelevant to [the] immunity analysis." *Graber v. City*

of *Ankeny*, 656 N.W.2d 157, 165 (Iowa 2003). Rather, the Court may only evaluate whether the decision "was based upon legitimate public policy considerations." *Id.*

The only policy consideration noted by Defendants is that Wilber balanced "incommensurable values (the interest of the public against that of Mr. Wilber) in order to establish a policy of settled priorities (ensure justice and keep the public informed)." Def.'s Br. in Support of Summ. J. at 19. The Court finds this argument is insufficient to satisfy Defendant's burden to show that the discretionary function exception applies. First, Defendants offer absolutely no evidence that shielding defamatory comments was an intended result of the discretionary function exception. Second, Defendants have not shown that any particular policy or social factor was considered or otherwise weighed in deciding to notify the public that Plaintiff is a murderer. Indeed, the Court can think of no plausible policy justification that would permit an elected public official to defame a private citizen merely because of a misguided belief that the public was entitled to know what Wilber thought of Harrington.[2] Because Defendants have failed to meet the burden to show the exception is applicable on the facts of this case, no immunity is afforded by the IMTCA.

### E. *Punitive Damages*

■■ Defendants next assert that the IMTCA expressly exempts both Wilber and Pottawattamie County from any claim for punitive damages. Plaintiff concedes that the County is exempted from liability

---

**1.** The Court notes that Defendants' cited "competing concerns" do not mention the right of a private citizen to be free from defamation.

**2.** At deposition, Wilber was asked, "Do you think you had a public duty to inform the public of your opinion as to who committed

this homicide?" Wilber replied "Honestly, I do." Wilber Dep. at 266. Wilber also, however, was asked "[W]hat part of that duty [to the public] does telling them your opinion that Terry Harrington committed that murder play?" Wilber replied, "That's completely irrelevant to that." *Id.* at 264.

for punitive damages pursuant to Iowa Code section 670.4(5), but notes that the Amended and Substituted Complaint only seeks punitive damages against Wilber. To the extent that any punitive damages claim may be asserted against the County, the Court agrees such claims are barred by statute. Defendants make no argument, however, and cite no authority for the proposition that punitive damages are barred as to Wilber, individually. Indeed, the Court finds that the IMTCA does not bar a claim for punitive damages against Mr. Wilber, and as such, summary judgment on the issue is denied.

## V. CONCLUSION

Defendants finally claim that any liability to be asserted against Pottawattamie County comes solely through Mr. Wilber as Pottawattamie County Attorney. "Thus, to the extent this Court enters summary judgment in favor of Mr. Wilber, it should enter summary judgment in favor of Pottawattamie County." Def.'s Br. in Support of Summ. J. at 20. The Court agrees with this general proposition, however, but finds that summary judgment in favor of Mr. Wilber is not warranted, as detailed *supra*. Accordingly, summary judgment is likewise not warranted in favor of Pottawattamie County.

For the reasons stated herein, the Court finds that Defendants are not entitled to summary judgment on any of the theories submitted in their motion. Therefore, Defendants' Motion for Summary Judgment (Clerk's No. 14) is DENIED.

IT IS SO ORDERED