# IN THE SUPREME COURT OF IOWA

No. 09–0663

Filed August 12, 2011

**KEVIN WALKER,**

    Appellee,

vs.

**STATE OF IOWA,**

    Appellant.

---

Appeal from the Iowa District Court for Page County, Timothy O'Grady, Judge.

The State appeals from an adverse ruling on its motion for summary judgment. **AFFIRMED AND CASE REMANDED.**

Thomas J. Miller, Attorney General, and Forrest Guddall and Anne E. Updegraff, Assistant Attorneys General, for appellant.

Nicholas W. Platt and Gregory T. Racette of Hopkins & Huebner, P.C., Des Moines, for appellee.

**WIGGINS, Justice.**

While an inmate at the Clarinda Correctional Facility (CCF), the plaintiff, Kevin Walker, was assaulted by another inmate and seriously injured. Walker brought a tort claim against the State, a correctional officer, and two activity specialists, claiming they negligently failed to ensure his safety. The State sought summary judgment based upon the discretionary function and intentional tort exceptions under Iowa Code section 669.14 (2005). The district court denied the State's motion, and the State filed an application for interlocutory appeal, which we granted. We now affirm the decision of the district court denying the State's motion for summary judgment.

## I. Background Facts and Prior Proceedings.

The State acknowledges that some of the underlying facts in the case are disputed, but it claims that it is entitled to summary judgment as a matter of law. A reasonable fact finder viewing the summary judgment record in the light most favorable to the plaintiff could find the following facts.

CCF is a medium-security correctional prison of the Iowa Department of Corrections (IDOC). On January 8, 2005, Kevin Walker, an inmate at CCF, had a confrontation with inmate Darrell Humphrey, during the breakfast turn out.[1] According to Walker, Humphrey, a jailhouse lawyer, approached another inmate, Willie Evans, who was involved in challenging a rules violation, and offered his services for a small fee. When Walker advised Evans that he could handle the matter on his own, Humphrey became angry with Walker and threatened to assault him. Evans then became angry with Humphrey and an

---

[1]"Turn out" means designated times for inmates to move from their cells or other locations to another in the institution such as the breakfast room or the gym.

argument between the two ensued. This argument continued as the group made its way through the breakfast line.

After going through the line, Humphrey sat at a different table from Walker, Evans, and another inmate, Edward Willingham. As they ate their breakfast, Evans and Humphrey continued to argue, shouting and threatening each other from their respective tables. According to Walker, the argument was louder than any other conversation in the room because the inmates had stopped talking and were listening to the argument. Walker did not report the threats, but asserts Correctional Officer Thomas Walston, who was staffing the breakfast turn out, could hear the argument, including the threats of assault. Officer Walston claims he could not hear the specifics of the conversation. However, after Humphrey left the unit, Officer Walston talked to the remaining inmates involved in the argument and asked them what the problem was and was told everything was fine.

A short time later, Humphrey returned to the unit with David Barnett. Barnett was in a different unit, and it was a rules violation for him to return with Humphrey. Evans and Willingham continued to argue with Barnett and Humphrey, with some pushing and shoving going on. Barnett indicated the argument would be settled at the next turn out, the exercise turn out. He indicated they could fight in the gym because the yard was too cold that day. Walker alleges Officer Walston overheard these statements.

At some point, Officer Walston approached the group and instructed Barnett to return to his unit. He did not, however, instruct Evans, who was on cell restriction, to return to his cell. When Barnett did not leave immediately, Officer Walston escorted him out of the unit

during which time Barnett made comments about settling the argument at the next turn out.

During the exercise turn out, Walker went to the gym and played basketball with other inmates. On the other side of the gym, Evans, Humphrey, and Barnett were fighting in a blind spot that could not be seen from the office in the gym.[2] When the fight was over, Barnett walked over to Walker, and stated something to the effect, "[T]his is what happens when you shoot your mouth off." Humphrey then approached Walker and assaulted him. The assault knocked Walker unconscious and broke his jaw.

At the time of the exercise turn out, two activity specialists, Noel Bogdanski and Richard Stipe, were on duty in the gym. They did not see the fight involving Evans, Barnett, and Humphrey, or the assault on Walker. Bogdanski was in the office of the gym either handing out equipment or filling out paperwork. Stipe was standing in the door of the gym as the inmates entered and could not see the areas where the two incidents occurred. Both Bogdanski and Stipe were aware of the blind spot in the gym, but did not monitor the area. Officer Walston filled out a disciplinary report regarding the breakfast incident, but not until after Walker was assaulted.

On August 3, 2006, Walker filed a tort claim, pursuant to Iowa Code chapter 669, against the State and the three correctional staff members, claiming injury and damages due to the defendants' negligence in failing to exercise reasonable care to protect Walker from a violent attack by another prisoner. On February 6, 2007, the State Appeal Board denied Walker's claim. Thereafter, Walker filed this petition.

---

[2]Officer Walston allowed inmate Evans to attend the turn out, even though he was on cell restriction and was not supposed to be able to go to the gym.

In his petition, Walker contends that (1) Bogdanski and Stipe were negligent in failing to properly supervise the exercise turn out, (2) Officer Walston was negligent for failing to alert Bogdanski and Stipe about the morning confrontations and the threats made about the fight, (3) all of the defendants were negligent in failing to ensure the safety of Walker in light of the dangerous situation that existed in the gym at the time Walker was injured, and (4) all the defendants were negligent for allowing a dangerous condition to exist in the gym. Pursuant to Iowa Code section 669.5(2)(*a*), the district court ordered the State substituted for the individually named defendants Walston, Bogdanski, and Stipe. *See* Iowa Code § 669.5(2)(*a*) (2007) (substituting the state for defendant where defendant in a suit was an employee of the state acting within the scope of the employee's employment at the time of the incident upon which the claim is based). Thereafter, the State filed a motion for summary judgment asserting the State was entitled to immunity pursuant to the discretionary function and intentional tort exceptions under Iowa Code section 669.14 (2005).

The State contended the policies of the IDOC permit prison staff to use discretion in taking corrective action in the management of inmate populations and in monitoring and supervising inmates, and therefore, the correctional staffs' actions are entitled to discretionary function exception under Iowa Code section 669.14(1). The State also asserted it is immune from any claim arising from an assault pursuant to Iowa Code section 669.14(4).

The district court denied the State's motion for summary judgment, concluding a genuine issue of material fact existed as to whether the prison staff involved had knowledge of hostility or a history of prior trouble involving Walker. It did not explicitly address the State's

contention that, as a matter of law, the discretionary function or intentional tort exceptions applied. The State filed a motion to reconsider, which the district court overruled. We granted the State's application for interlocutory appeal to determine whether the discretionary function and intentional tort exceptions apply in this case.

## II. Scope of Review.

We review the denial of a motion for summary judgment for correction of errors at law. *Doe v. Cedar Rapids Cmty. Sch. Dist.*, 652 N.W.2d 439, 442 (Iowa 2002). Summary judgment is appropriate

> if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law.

Iowa R. Civ. P. 1.981(3); *accord Doe*, 652 N.W.2d at 442.

A genuine issue of fact exists if reasonable minds can differ on how an issue should be resolved. *Seneca Waste Solutions, Inc. v. Sheaffer Mfg. Co.*, 791 N.W.2d 407, 411 (Iowa 2010). When a fact's determination might affect the outcome of the suit, it is material. *Id.*; *see also Baratta v. Polk County Health Servs.*, 588 N.W.2d 107, 109 (Iowa 1999).

## III. Merits.

**A. Iowa Tort Claims Act.** The Iowa Tort Claims Act (ITCA) permits an action by a prisoner "when the state negligently permits one in its custody to be injured by the violent assault of another prisoner." *Barnard v. State*, 265 N.W.2d 620, 621 (Iowa 1978); *cf. United States v. Muniz*, 374 U.S. 150, 165, 83 S. Ct. 1850, 1859, 10 L. Ed. 2d 805, 816 (1963) (noting the Federal Tort Claims Act allows for damages for employee negligence in failing to protect federal prisoners). Although not an insurer of a prisoner's safety, the state must exercise reasonable care to protect the prisoner from harm. *Barnard*, 265 N.W.2d at 621. For an

inmate to recover for injuries incurred in an attack by another inmate, the inmate must establish: "(1) the state institution knew or should have known that a specific inmate suffered a risk of harm, and (2) the institution failed to use reasonable care to prevent the attack on the inmate." *Speller v. State*, 528 N.W.2d 678, 679 (Iowa Ct. App. 1995) (citing *Mosby v. Mabry*, 697 F.2d 213, 215 (8th Cir. 1982)); *accord Barnard*, 265 N.W.2d at 621–22 (noting that while not an exclusive list of circumstances, liability has been imposed when threats, incidents of prior violence, and other reasonable cause to fear physical harm have been brought to the attention of authorities; when there has been a failure to provide adequate supervision; and when authorities have placed known hostile persons where they have access to each other). The question raised is whether the discretionary function and intentional tort exception provisions of the Act provide the State with immunity from liability.

**B. Discretionary Function Exception.** A governmental entity is entitled to immunity only to the extent permitted by statute. *Doe*, 652 N.W.2d at 443. "[L]iability is the rule and immunity the exception." *Id.* Thus, we narrowly construe the discretionary function exception. *Madden v. City of Eldridge*, 661 N.W.2d 134, 138 (Iowa 2003). The government has the burden of establishing entitlement to the statute's protection. *Ette ex rel. Ette v. Linn-Mar Cmty. Sch. Dist.*, 656 N.W.2d 62, 68 (Iowa 2002).

The Iowa Code provides the State shall be immune from tort liability for

> [a]ny claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a state agency or an employee of the state, whether or not the discretion be abused.

Iowa Code § 669.14(1).

In *Goodman v. City of LeClaire*, 587 N.W.2d 232 (Iowa 1998), we abandoned the planning/operational bright-line test and adopted the two-prong analysis advocated in *Berkovitz v. United States*, 486 U.S. 531, 108 S. Ct. 1954, 100 L. Ed. 2d 531 (1988), to determine whether the discretionary function exception was applicable in a negligent excavation claim brought against a city under the Municipal Tort Claims Act. 587 N.W.2d at 238 (adopting the *Berkovitz* two-step analysis). We subsequently concluded this analysis was equally applicable under the ITCA. *See Schmitz v. City of Dubuque*, 682 N.W.2d 70, 72 (Iowa 2004); *accord Anderson v. State*, 692 N.W.2d 360, 364 (Iowa 2005).

Under the *Berkovitz* test, the court must initially determine whether the act in question was a matter of choice for the acting employee. *Berkovitz*, 486 U.S. at 536, 108 S. Ct. at 1958, 100 L. Ed. 2d at 540. The discretionary function exception is inapplicable when a statute, regulation, or policy requires a course of action for an employee to follow. *Id.* Next, if the action involved discretion on the part of the employee, the court must consider whether the judgment was of the kind the exception was designed to protect. *Id.*; *accord Anderson*, 692 N.W.2d at 364. We have adopted the Supreme Court view that the discretionary function exception " 'protects only governmental actions and decisions based on considerations of public policy.' " *Anderson*, 692 N.W.2d at 364 (quoting *Berkovitz*, 486 U.S. at 536–37, 108 S. Ct. at 1959, 100 L. Ed. 2d at 541). The basis for the discretionary function exception is to " 'prevent judicial "second guessing" of . . . administrative decisions grounded in social, economic, and political policy' through tort litigation, thereby protecting [states] 'from liability that would seriously handicap efficient

government operations.' " *Ette*, 656 N.W.2d at 67 (quoting *Goodman*, 587 N.W.2d at 237).

> [T]he primary factor in determining whether a particular activity qualifies as a discretionary function is whether the decision to act involves the evaluation of broad policy factors. If so, the decision is more likely to be characterized as a discretionary function.

*Keystone Elec. Mfg. v. City of Des Moines*, 586 N.W.2d 340, 348 (Iowa 1998) (citation omitted).

The appropriate analytical framework has thus been summarized as follows:

> An inquiring court first must identify the conduct that allegedly caused the harm. . . . The issue, then, is whether this conduct is of the nature and quality that [the government], in crafting the discretionary function exception, sought to shelter from tort liability. That issue encompasses two questions: Is the conduct itself discretionary? If so, is the discretion susceptible to policy-related judgments?

*Shansky v. United States*, 164 F.3d 688, 690–91 (1st Cir. 1999); *accord Ette*, 656 N.W.2d at 67.

1. *Conduct at issue.* The first step in our analysis is to determine the exact conduct that is at issue. *Ette*, 656 N.W.2d at 67. As previously noted, the State must exercise reasonable care to protect prisoners from harm. *Barnard*, 265 N.W.2d at 621. Walker generally contends the State was liable under Iowa Code chapter 669 for the negligent supervision of inmates, negligently failing to ensure his safety, and negligently allowing a dangerous condition to exist in the gym.

2. *Did the correctional staffs' actions involve discretion?* With regards to Officer Walston, Walker alleged he failed to use reasonable care because he failed to (1) alert staff and security of what was going to happen in the gym, (2) write disciplinary notices on the involved inmates for minor and/or major rule violations, (3) request an investigation and

segregation of the involved inmates, (4) prevent inmate Barnett from being out of placement, (5) prevent inmate Evans from leaving his unit in violation of his cell restriction, and (6) engage in further discussions with the inmates about the breakfast turn out argument. Walker asserts the State is not immune under the discretionary function exception because prison policies and procedures mandated Officer Walston take specific actions in light of the escalating verbal and physical confrontation between the inmates. Walker further contends Activity Specialists Bogdanski and Stipe were negligent because they failed to maintain direct supervision over the inmates participating in recreational activities in the gym in violation of a mandatory policy. We begin our analysis by considering the policies Walker contends were violated by the activity specialists.

Walker relies on CCF policy IO-SC-10 which provides that "[s]taff must stay out of office areas to the greatest extent their duties allow and remain in personal contact with the offenders in their units," and that "[o]ffenders involved in recreation activity . . . shall be subject to direct staff supervision at all times when they are engaged in such activity." Walker claims this policy required the activity specialists to provide "direct supervision [of inmates] at all times" and that their failure to do so subjected him to injury. Walker asserts the activity specialists were aware of a blind spot in the gym where inmates could not easily be observed and that neither activity specialist was specifically supervising the inmates or observing the blind spot, which resulted in their failure to discover a fight between inmates that lasted up to fifteen minutes.

Upon our review, we disagree with Walker's conclusion this policy imposed a nondiscretionary duty on the activity specialists in their supervision of the inmates during their recreational period. Although the

policy directs staff to stay out of office areas and remain in personal contact with offenders, the requirement is not absolute. The policy is conditioned by the additional language "to the greatest extent their duties allow." The policy clearly anticipates the need for prison staff to use their discretion in the provision of supervision and acknowledges that there are times when the job will require staff to be in an office area. *Cf. Calderon v. United States*, 123 F.3d 947, 950 (7th Cir. 1997) (holding the Bureau of Prison's policy provides a mandatory duty of safekeeping, but did not direct the manner by which it must be fulfilled, thereby providing for discretion on the part of prison personnel); *accord Parrott v. United States*, 536 F.3d 629, 637 (7th Cir. 2008). We also do not find the provision providing that offenders engaged in recreational activity "shall be subject to direct staff supervision at all times" placed a nondiscretionary duty on the activity specialists. Although the policy places a duty on the staff, it did not define "subject to direct staff supervision," leaving the means and method of carrying out the duty subject to discretion. *Cf. Cohen v. United States*, 151 F.3d 1338, 1343 (11th Cir. 1998) (noting that "even though a statute or regulation imposes a general duty on a government agency the discretionary function exception may still apply if the agency retains sufficient discretion in fulfilling that duty"); *Ochran v. United States*, 117 F.3d 495, 500 (11th Cir. 1997) (holding the use of the language "shall . . . protect" did not mean that the regulation "left no room for the [U.S. Attorney] to exercise judgment or choice" about how to protect witnesses). Walker has failed to identify any prison policy or procedure that required a specific course of action for the activity specialists to follow in their supervision of inmates during the exercise turn out. Therefore, we

conclude the supervision of inmates during the exercise turn out involved discretionary conduct on the part of the activity specialists.

Walker asserts CCF policies IN-VI-21, IS-CL-04, IO-SM-02, and PO-V-17 required Officer Walston to take specific actions and did not allow him to use his discretion under the circumstances. IDOC policy IS-CL-04 is entitled "Keep Separates." It provides: "Staff who become[] aware of an event or situation between two offenders that may potentially pose a risk to the offenders while housed in an institution or residential facility shall report that information to the . . . Shift Supervisor." While policy IS-CL-04 required the reporting of events or situations that may constitute a danger to inmates, the policy does not expressly provide what constitutes a potential risk to the offender and, therefore, such a determination must rely on the judgment or discretion of the staff. Moreover, the policy does not require the report be prepared immediately. The policy provides discretion to staff in the handling of the reporting function.

Policy IO-SM-02, A-2a is entitled "Administrative Segregation." It provides: "An offender may be placed in (Administrative Segregation) AS3 at any time the Shift Supervisor determines there is credible evidence that the offender may be in physical danger." Policy IO-SM-02 is also discretionary. It allows the shift supervisor to use his or her discretion to determine whether an offender needs to be placed in administrative segregation for their protection. *Cf. Cohen*, 151 F.3d at 1343 (holding the statutory provision did not mandate a specific, nondiscretionary course of conduct for the bureau of prisons to follow in classifying prisoners). This policy did not mandate any specific action on the part of Officer Walston.

Under policy PO-V-17, a unit officer was required to "[m]aintain security of [the unit] and control of the offenders at all times." Like the policies already addressed, this policy imposes a general duty without prescribing any specific mandatory action by staff and allows for staff discretion in maintaining security and control of offenders.

Policy IN-VI-21 was the correctional facility disciplinary policy in effect at the time of the incident occurring prior to Walker's assault.[3] Part IV of the policy provides for the disciplinary procedures to be used for major offenses. The policy defines major offenses to include assault, fighting, threats and intimidation, out of placement of assignment, and obstructive or disruptive conduct.[4] Walker relies on the following portion of this policy to assert Officer Walston violated institutional policy in his handling of the situation at the breakfast turn out.

A. Preparing The Disciplinary Report

1. Whenever an employee observes or discovers misconduct or a threatening situation, the employee *will, if possible, direct the offender to take corrective action. If the corrective action is insufficient or circumstances warrant,* a disciplinary form *may* be completed. In either event, *all incidents shall be documented.*

   *Any offender behavior which constitutes criminal behavior or a serious threat to the safety and order of the employees, offenders, or property of an institution shall be reported* by the employee observing the incident or to whom the situation has been reported if observed by a non-employee.

2. Violations *shall be reported* on the Disciplinary Report Form IN-V-36 F-1 and forwarded to the shift supervisor for further review.

---

[3]IN-VI-21 was replaced by IO-RD-01 effective April 2008. We do not consider whether our analysis would be the same under the current policy.

[4]The disciplinary policy defines each of these offenses. However, for summary judgment purposes, we assume, without deciding, that during the breakfast turn out one or more of these offenses occurred.

. . . .

4. Disciplinary reports are to be *promptly* forwarded to the shift supervisor or designate official . . . .

5. Shift supervisor . . . shall make an initial determination of the status of the offender pending disciplinary procedures. *If necessary for the safety and security of staff and other offenders, the offender may be assigned to administrative segregation.*

(Emphasis added.)

Walker acknowledges the policy provides that if an officer encounters misconduct or a threatening situation, the officer *may* attempt to resolve the issue by directing the inmate to take corrective action, and that, if the corrective action is insufficient or circumstances warrant, the officer *may* complete a disciplinary report. Such language requires no mandatory action on the part of the officer and clearly allows for an officer to use his or her discretion. *See Dykstra v. U.S. Bureau of Prisons,* 140 F.3d 791, 795 (8th Cir. 1998) (holding prison policy did not require prison counselor to warn inmate that his youthful appearance made him vulnerable to attack prior to obtaining waiver of protective custody); *Calderon,* 123 F.3d at 949 (finding prison disciplinary regulation, which allowed staff to consider informal resolution of an incident gave prison personnel room for judgment in determining whether to sanction an inmate). Officer Walston did, in fact, take corrective action by talking to the inmates and inquiring what the problem was. At various points, he instructed inmates to return to their cells or units.

Walker asserts however, that the subsequent language in the regulation required Officer Walston to take further action under the circumstances presented. The regulation required Officer Walston to report all incidents. Moreover, it required *criminal behavior or serious*

*threats* to safety to be reported on a disciplinary form and promptly forwarded to the shift supervisor. The shift supervisor would then determine whether it was necessary for the safety and security of staff and other offenders that the offender be assigned to administrative segregation. Walker alleges Officer Walston was aware, after overhearing the threats of assault and confronting Humphrey and Barnett, that the inmates were anticipating a fight. Walker argues, under these circumstances, the regulation required Officer Walston to make a prompt report to his supervisor, who would then make the determination whether there was credible evidence that an inmate may be in physical danger and impose administrative segregation.

The State disputes Walker's interpretation of the regulation. Although the regulation requires documentation of misconduct or a threatening situation, the State asserts the policy does not mandate the type, timing, or manner of documentation. Those matters, the State contends, are subject to staff discretion. Moreover, assuming Officer Walston was required to document the verbal altercation, he did so later in the day. Similarly, while the regulation also requires that criminal behavior or a serious threat to the safety and order of an institution *shall* be reported, the State contends there is no policy or rule for determining when conduct rises to the level of criminal behavior or a serious threat, and therefore, it was a judgment call best left to the discretion of the prison staff. In support, the State relies on the affidavit of Associate Warden/Security at CCF, Jim Payne. In addressing the policies and procedures regarding inmate violations, Associate Warden Payne stated:

> 3. There is no written policy or procedure mandating that when a correctional officer or other staff member observes an inmate violating a minor or major rule that an inmate disciplinary report be completed or that the inmate be referred to the shift captain for segregation and lock up.

4. To the contrary the Correctional Officer or the staff member is encouraged by written policy and procedure and also through training, to attempt other less drastic corrective action when possible.

5. The Correctional Officer or staff member must make a decision based on judgment on what corrective action is appropriate for the situation or event. Proper corrective action can include anything from making your presence known, to talking with the inmate, to a verbal warning, to referring the matter to a shift manager to consider segregation or lock up, or sending the inmates to their cells.

The State also argues that there was no criminal behavior or serious threat to the safety and order of the institution after Officer Walston spoke with the inmates. The State asserts the regulation requires the exercise of judgment and discretion similar to that found in *Calderon.*

In *Calderon,* a federal prison inmate informed prison personnel of threats he had received from another inmate, Perez. 123 F.3d at 948. Federal prison disciplinary regulations provided that " '[s]taff shall take disciplinary action at such times and to the degree necessary to regulate an inmate's behavior within the Bureau rules and institution guidelines and to promote a safe and orderly institution environment.' " *Id.* at 949 (quoting 28 C.F.R. § 541.10(b)(2)). The regulations further defined " '[t]hreatening another with bodily harm or any other offense' " as a prohibited act for which disciplinary action must be taken. *Id.* (quoting 28 C.F.R. § 541.13). The same regulations also required that

"when [the] staff witnesses or has reasonable belief that a violation of [prison] regulations has been committed by an inmate, and when staff considers informal resolution of the incident inappropriate or unsuccessful, staff shall prepare an Incident Report and promptly forward it to the appropriate [supervisor]."

*Id.* (quoting 28 C.F.R. § 541.14(a)). Prison personnel took no steps to protect Calderon or to discipline Perez, who eventually attacked and

seriously injured Calderon. *Id.* at 948. The government claimed the decision not to separate Calderon and Perez involved a discretionary act and therefore liability was barred under the Federal Tort Claims Act (FTCA). *Id.*

In reviewing the federal regulations for addressing inmate misconduct, the court found that none of the cited regulations set forth any mandatory, nondiscretionary disciplinary action that required prison personnel to take specific action against Perez prior to his attack on Calderon. *Id.* at 949–50. First, the regulations did not specify any particular type of action personnel are required to take with respect to inmate discipline. Second, while section 541.14 may require an incident report, which might ultimately lead to the imposition of a sanction, the court noted that such action was only required when (1) prison personnel witness or have a reasonable belief that a violation has occurred, and (2) when staff considers informal resolution inappropriate. Calderon presented no evidence that prison personnel witnessed any violation of prison regulations or made any formal finding that Perez had actually committed any prohibited acts. *Id.* at 950. The court, therefore, found the regulations clearly gave the prison personnel discretion in determining whether to sanction Perez.[5] *Id.* The court also rejected

---

[5]The Seventh Circuit also rejected the defendant's argument that the "reasonable belief" standard should be interpreted as "when a reasonable staff person would have had a belief that a violation occurred." *Calderon*, 123 F.3d at 950 n.1. It concluded that if the discretionary function exception could be pierced by a showing of negligence, then it was no shield at all. *Id.* In *Parrott v. United States*, 536 F.3d 629, 637 (7th Cir. 2008), the Seventh Circuit held that while 18 U.S.C. § 4042 provided a mandatory duty of care, it did not provide the manner by which that duty was to be fulfilled. However, it continued, an inmate was only required to show that the prison staff knew or reasonably should have known of a potential problem between two inmates, seemingly a step away from *Calderon*. *Parrott*, 536 F.3d at 637. The appellate court concluded that the district court made no findings about what the prison official should have known about the risks of placing Parrott in the same work detail as another inmate and that this might be enough to warrant a remand on Parrott's failure-to-protect claim. In the end, however, the decision to remand was due to disputed

Calderon's argument that 18 U.S.C. § 4042, which provides the Bureau of Prisons "shall . . . provide for the safekeeping, care, and subsistence of all persons charged with or convicted of offenses against the United States," required any mandatory action of the prison personnel. *Id.* at 950.

The State's reliance on *Calderon* is misplaced. In *Calderon*, the statute required action and a report when (1) a violation was witnessed or when a reasonable belief that a regulation violation had occurred and (2) prison personnel determined informal resolution was inappropriate or unsuccessful. *Id.* at 949. In *Calderon*, the court found there was no evidence that prison personnel witnessed any violation of prison regulations or made any formal finding that Perez had actually committed any of the prohibited acts. *Id.* at 950. Here, however, the regulations required

> [a]ny offender behavior which constitutes criminal behavior or a serious threat to the safety and order of the employees, offenders, or property of an institution *shall be reported* . . . on the Disciplinary Report Form IN-V-36 F-1 and [promptly] forwarded to the shift supervisor . . . [who] shall make an initial determination of the status of the offender pending disciplinary procedures . . . [and] if necessary for the safety and security of staff and other offenders, the offender may be assigned to administrative segregation.

We agree with the State that while the regulation provides discretion as to the reporting and handling of "misconduct or a threatening situation," with respect to "criminal behavior or a serious threat," the regulation requires the officer to promptly report to the shift supervisor. Pursuant to Policy IN-VI-21, assault is defined as "intentionally caus[ing] or threaten[ing] to cause injury to another

---

issues of material fact as to whether the contents of a previously entered separation order left prison personnel without discretion to keep Parrott and the other inmate separate. *Id.* at 637–38.

person," and is categorized as a major offense under the disciplinary regulations. "Promptly" means "immediately" or "quickly". *Webster's Third New International Dictionary* 1816 (unabr. ed. 2002) [hereinafter *Webster's*]. However, because at this stage the material facts are disputed, we are unable to determine whether, for example, an assault, which by definition constitutes criminal behavior, occurred and would, under the circumstances, constitute a serious threat. Because material facts are at issue, i.e., whether Officer Walston overheard threats of assault and preparation for a fight during the exercise turn out, it is not possible to determine whether the regulation required Officer Walston to prepare a report, which must then be *promptly* forwarded to the shift supervisor for review and consideration of any potential additional safety measures. *See Ashford v. United States*, 511 F.3d 501, 505 (5th Cir. 2007) (holding summary judgment improper where inmate claimed he raised safety concerns during intake interview which would, under prison policy, have required him to be put in solitary confinement until an investigation could be conducted); *see also Schneider v. State*, 789 N.W.2d 138, 146–47 (Iowa 2010) (holding the discretionary function doctrine had no application because the State had no discretion in determining whether the bridge could be designed and built to encroach on a floodway).

3. *Was the discretion susceptible to policy-related judgments?* Nevertheless, even if we conclude none of the policy provisions discussed required mandatory action by prison personnel, we conclude the discretionary function exception is not applicable in this case because the decisions by prison staff in the supervision of the inmates did not involve the evaluation of broad public policy factors. Individual judgments protected by the discretionary function exception must be

based on considerations of public policy. *Anderson*, 692 N.W.2d at 364. The record must show

> the governmental entity based its actions on the required policy considerations, as distinguished from an action arising out of the day-to-day activities of the business of government. Unless a governmental entity can demonstrate that when it exercised its judgment, it genuinely could have considered and balanced factors supported by social, economic, or political policies, we will not recognize the discretionary function immunity.

*Id.* at 366.

> In other words, an immune governmental action is one that weighs competing ideals in order to promote those concerns of paramount importance over the less essential, opposing values. Whether or not the [governmental actor] actually made its decision with policy considerations in mind is not determinative. Instead, the [governmental entity's] actions . . . must be amenable to a policy-based analysis. The circumstances must show the [entity] legitimately could have considered social, economic, or political policies when making judgments as to [the supervision of prison inmates].

*Graber v. City of Ankeny*, 656 N.W.2d 157, 165 (Iowa 2003).

The State argues the evidence supports the conclusion correctional staff, in supervising the inmates and addressing inmate behavior, could have considered social and economic policies. Specifically, the State notes the legislature has granted the IDOC statutory authority to create disciplinary procedures and adopt rules pertaining to the internal management of penal institutions within the state. *See* Iowa Code §§ 904.108(1)(*a*), (*k*); .205. Under these rules, staff is given discretion in the application of corrective action and the reporting of rule violations. In his affidavit, Associate Warden Payne maintained such discretion is necessary because rule violation is very common in prison. If every rule violation resulted in a disciplinary report or segregation, he asserted, the correctional staff would be unable to perform their job, which would result in the deterioration of the safe and efficient operation of the

facility. It would require more staff to be hired, an economic consideration. Moreover, the increased disciplinary action and lock ups would produce inmate dissatisfaction and frustration, resulting in threats to the safe and efficient operation of the facility. The State argues this case is similar to and governed by our analysis in *Anderson*.

In *Anderson*, the plaintiff brought a premise liability claim, asserting the State was negligent for failing to close the university library due to inclement weather. 692 N.W.2d at 361. The evidence established the university had a written policy concerning operations during adverse weather. *Id.* at 362. In deciding whether the discretionary function exception applied to the dean's decision not to close the library early, we considered our application of the discretionary function exception in other cases. In cases where we held the exception inapplicable, the record showed the governmental entity did not base its action on required policy considerations, but rather the action arose out of the day-to-day activities of the business of government. *Id.* at 364–66 (citing *Madden*, 661 N.W.2d at 139–40 (holding building inspector's decision not to inspect dry wall was ad hoc and there was no evidence to suggest engagement in policy analysis); *Ette*, 656 N.W.2d at 69 (holding school's decision to send student home alone on bus was not a judgment call driven by social, economic, or political concerns); *Messerschmidt v. City of Sioux City*, 654 N.W.2d 879, 881 (Iowa 2002) (holding decision to remove a road barricade did not involve policy-making decisions and city had "not met its burden to prove considerations based on social, economic, or political policy were involved in its decision"); *Doe*, 652 N.W.2d at 444–45 (holding school failed to show any social, political, or economic factors as basis for decision to hire, retain, and supervise a particular teacher); *Bellman v. City of Cedar Falls*, 617 N.W.2d 11, 19 (Iowa 2000) (holding teacher's decision in supervising children was not

based upon policy considerations)). We held that "[u]nless a governmental entity can demonstrate that when it exercised its judgment, it genuinely could have considered and balanced factors supported by social, economic, or political policies, we will not recognize the discretionary function immunity." *Id.* at 366 (citing *Graber*, 656 N.W.2d at 165).

Applying this test to the facts, in *Anderson* we found the dean considered and balanced the same factors used by the university when it formulated the policy: providing the maximum opportunity for students and staff to utilize the library, thus furthering the public policy of providing the best college education at a reasonable cost, against the adequacy of the staff and the number of persons using the library facilities. *Id.* Because the dean could balance these policy considerations in making her determination, we concluded the discretionary function exception applied.

Here, we conclude the discretionary function exception is not applicable because the decisions made by the correctional staff in the supervision of the inmates did not involve the evaluation of broad public policy factors. The correctional staffs' handling of the confrontation during the breakfast turn out and their supervision of the inmates during the exercise turn out was not the product of a judgment call driven by legitimate social, economic, or political concerns. As we held in *Madden*,

> While most governmental actions involve some degree of discretion, only those choices based upon the "meaningful exercise of discretion" are immune from liability. The critical distinction "is the one between a judgment that embodies a professional assessment undertaken pursuant to a policy of settled priorities and a fully discretionary judgment that balances incommensurable values in order to establish those priorities." An immune government function is "one that weighs competing ideals in order to promote those concerns

of paramount importance over the less essential, opposing values."

661 N.W.2d at 139 (quoting *Graber*, 656 N.W.2d at 164–65). There is no evidence that, in their supervision of the inmates, the correctional staff could have or did weigh competing ideals or balance incommensurable values to promote those concerns of paramount importance. Rather, as in *Madden*, the actions of the correctional staff "embod[ied] a professional assessment undertaken pursuant to a policy of settled priorities." *Id.*

The decisions made by Officer Walston in handling the situation that unfolded during the breakfast turn out and the activity specialists' supervision of the inmates in the gym during the exercise turn out were ad hoc decisions. *See Webster's* at 26 (defining "ad hoc" as "made, established, acting, or concerned with a particular end or purpose" and "without reference to wider application"). There is nothing in the record to suggest that in performing their duties, the correctional staff could have weighed competing ideals in order to determine how to supervise the inmates.

We acknowledge the State's reliance on several federal cases in which the federal courts found the discretionary function exception applicable against claims prison officials were negligent in failing to protect inmates. *See, e.g., Santana-Rosa v. United States*, 335 F.3d 39, 43–44 (1st Cir. 2003) (finding prison's decisions regarding maintenance of cleaning supplies and inmate work assignments are susceptible to policy-related analysis and therefore inmate's FTCA claim for failure to protect him from other inmate was held to fall within the discretionary function exception); *Cohan*, 151 F.3d at 1344 (holding discretionary function exception shielded federal prisoner's claim asserting Bureau of Prisons negligently assigned his attacker to a minimum security prison on the basis that "[d]eciding how to classify prisoners and choosing the

institution in which to place them are part and parcel of the inherently policy-laden endeavor of maintaining order and preserving security within our nation's prisons"); *Calderon*, 123 F.3d at 950 (holding that when the inmate has presented no evidence the prison officials witnessed any violation of prison regulations the actions are presumed grounded in public policy and the discretionary function exception applies); *Dykstra*, 140 F.3d at 795–96 (holding "[w]hen established policy allows governmental agents to exercise discretion, 'it must be presumed that the agent's acts are grounded in policy when exercising that discretion'" to dismiss inmate's claim prison staff was negligent in failing to warn him his youthful appearance put him at risk of harm before he waived his option to be placed in protective custody (quoting *United States v. Gaubert*, 499 U.S. 315, 324, 111 S. Ct. 1267, 1274, 113 L. Ed. 2d 335, 348 (1991))); *Buchanan v. United States*, 915 F.2d 969, 972 (5th Cir. 1990) (where prison officials and staff considered the potential for violence in response to the announcement of the Cuban repatriation agreement before deciding transferring the American prisoners would heighten the tension and create greater fear among Cuban detainees and that a lock-down would be extremely difficult and possibly counter-productive, discretionary function exception applicable because prison officials could and did consider and balance factors supported by social, economic, or political policies); *see also Feltes v. State*, 385 N.W.2d 544, 547 (Iowa 1986) (noting ITCA was modeled after the FTCA and we give great weight to relevant federal decisions). Most of these cases rely upon the United States Supreme Court's holding in *Gaubert*. *See Santana-Rosa*, 335 F.3d at 43–44; *Cohen*, 151 F.3d at 1344; *Calderon*, 123 F.3d at 950; *Dykstra*, 140 F.3d at 795. *But see Buchanan*, 915 F.2d at 972

(decided prior to *Gaubert*). Therefore, we find it helpful to consider *Gaubert* and its analysis.

In *Gaubert*, a shareholder of an insolvent savings and loan association brought an action against the United States under the FTCA. 499 U.S. at 320, 111 S. Ct. at 1272, 113 L. Ed. 2d at 345. After the savings and loan went into receivership, the shareholder alleged negligence of federal officers and directors in selecting the new officers and directors and in participating in the day-to-day management of the savings and loan. *Id.* The district court granted the government's motion to dismiss, holding all of the challenged actions fell within the discretionary function exception to the FTCA. *Id.* The Supreme Court granted certiorari.

In applying the second prong of the *Berkovitz* test, the Court noted:

> Where Congress has delegated the authority to an independent agency or to the Executive Branch to implement the general provisions of a regulatory statute and to issue regulations to that end, there is no doubt that planning-level decision establishing programs are protected by the discretionary function exception, as is the promulgation of regulations by which the agencies are to carry out the programs. . . . [T]he actions of Government agents involving the necessary element of choice and grounded in the social, economic, or political goals of the statute and regulations are protected.

*Id.* at 323, 111 S. Ct. at 1274, 113 L. Ed. 2d at 347. Summarizing the application of the test, the Court held:

> [I]f a regulation mandates particular conduct, and the employee obeys the direction, the Government will be protected because the action will be deemed in furtherance of the policies which led to the promulgation of the regulation. If the employee violates the mandatory regulation, there will be no shelter from liability because there is no room for choice and the action will be contrary to policy. *On the other hand, if a regulation allows the employee discretion, the very existence of the regulation creates a strong presumption that a discretionary act authorized by the*

*regulation involves consideration of the same policies which led to the promulgation of the regulations.*

*Id.* at 324, 111 S. Ct. at 1274, 113 L. Ed. 2d at 347 (emphasis added) (citation omitted). Thus, *Gaubert* held that

> [w]hen established governmental policy . . . allows a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion. For a complaint to survive a motion to dismiss, it must allege facts which would support a finding that the challenged actions are not the kind of conduct that can be said to be grounded in the policy of the regulatory scheme.

*Id.* at 324–25, 111 S. Ct. at 1274–75, 113 L. Ed. 2d at 348. The Court held that the focus was not on the subjective intent of the agent exercising the discretion conferred by the regulation, but rather on the nature of the actions taken and their susceptibility to policy analysis. Thus, there is a presumption that discretionary acts performed pursuant to relevant policies, including those performed in the day-to-day operations, are entitled to the exemption. *Id.* at 332–33, 111 S. Ct. at 1278–79, 113 L. Ed. 2d at 352–53.

Although concurring in the judgment, Justice Scalia wrote separately to voice his disagreement with the analysis employed by the majority. *Id.* at 334, 111 S. Ct. at 1280, 113 L. Ed. 2d at 354 (Scalia, J., concurring in part and concurring in judgment). In his concurrence, Justice Scalia examines the oft times confusing application of the second portion of the two-prong *Berkovitz* test. Noting that the discretionary function exception to the FTCA does not protect all governmental activities involving choice, Justice Scalia observed that the choice "must represent a 'policy judgment.'" *Id.* at 335, 111 S. Ct. at 1280, 113 L. Ed. 2d at 354. While acknowledging that the planning/operational dichotomy is wrong, Justice Scalia nevertheless argued "that the level at

which the decision is made is often *relevant* to the discretionary function inquiry, since the answer to that inquiry turns on *both* the subject matter *and* the office of the decisionmaker." *Id.* at 335, 111 S. Ct. at 1280, 113 L. Ed. 2d at 355. In his view, a discretionary choice was shielded from liability only "if the choice is, under the particular circumstances, *one that ought to be informed by considerations of social, economic, or political policy and is made by an officer whose official responsibilities include assessment of those considerations.*" *Id.* (emphasis added) (noting, as an example, the dock foreman's decision to compactly store bags of fertilizer would not be protected, even if he calculated cost versus safety, because it was not his responsibility to ponder such things).

We note *Gaubert* involved a motion to dismiss and the presumption that when there is an established governmental policy that allows for discretion, "it must be presumed that the agent's acts are grounded in policy when exercising that discretion." *Gaubert*, 499 U.S. at 324, 111 S. Ct. at 1274, 113 L. Ed. 2d at 348. Although we have previously cited *Gaubert, see Goodman,* 587 N.W.2d at 238; *Schneider,* 789 N.W.2d at 147, it does not appear that we have adopted this presumption, but rather our analysis in our prior discretionary function cases are more in line with Justice Scalia's analysis in determining whether the discretionary function exception is applicable. *See Anderson,* 692 N.W.2d at 366 (finding dean's decision not to close library during inclement weather could be and was based upon a balancing of public policy factors); *Madden,* 661 N.W.2d at 140 (during performance of a routine duty "public official did not weigh any broad-sweeping policies before he decided not to perform a required inspection"); *Ette,* 656 N.W.2d at 69 (holding supervision of students "is not . . . driven by

public policy implications uniquely within the purview of school officials and employees"); *Messerschmidt*, 654 N.W.2d at 883 ("Matters such as when to lift a temporary road barricade do not require evaluation of policies but instead involved implementation of everyday decisions routinely made by the city."); *Doe*, 652 N.W.2d at 445 (noting that it is possible to articulate some notion of policy considerations involved in any decision but that the administrative act of hiring, retaining, and supervising an individual teacher does not involve the careful balancing of competing interests, risks, and advantages, and does not elevate such decision to the level of economic, political, or social policymaking); *Bellman*, 617 N.W.2d at 19 (holding while a teacher's supervisory duties involve matters of judgment, policy considerations are not involved in the decisions made by a teacher in supervising her class); *see also Butler ex rel. Biller v. Bayer*, 168 P.3d 1055, 1067 (Nev. 2007) (holding decision to parole inmate requires analysis of multiple social, economic, efficiency, and planning concerns, but the actions of effectuating inmate's postparole placement, while it may have required the exercise of some judgment or choice, were not actions based on the consideration of any social, economic, or political policy); *Martinez v. Maruszczak*, 168 P.3d 720, 729 (Nev. 2007) (applying *Berkovitz-Gaubert* test in medical malpractice case and clarifying that decisions at all levels of government, including frequent or routine decisions, may be protected by the discretionary act exception, but only if the decisions require analysis of government policy concerns).

Because we have concluded the decisions made by the correctional staff in the supervision of the inmates, in this instance, did not involve the evaluation of broad public policy factors, we necessarily conclude the State is not entitled to the discretionary function exception and the

district court did not err in denying the State's motion for summary judgment.

**C. Intentional Tort Exception.** The State also claims another section of the ITCA bars Walker's claim. The section provides:

> The provisions of this chapter shall not apply with respect to any claim against the state, to:

> 4. Any claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights.

Iowa Code § 669.14(4). The legislature intended the ITCA to have the same effect as the FTCA. *Feltes*, 385 N.W.2d at 547. Thus, we give great weight to relevant federal decisions interpreting the Federal Act. *Id.*

The FTCA provides:

> The provisions of this chapter and section 1346(b) of this title shall not apply to—

> . . . .

> (h) Any claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights: *Provided*, That, with regard to acts or omissions of investigative or law enforcement officers of the United States Government, the provisions of this chapter and section 1346(b) of this title shall apply to any claim arising, on or after the date of the enactment of this proviso, out of assault, battery, false imprisonment, false arrest, abuse of process, or malicious prosecution.

28 U.S.C. § 2680 (2006). These provisions are commonly referred to as the intentional tort exceptions to the Act. *Sheridan v. United States*, 487 U.S. 392, 394, 108 S. Ct. 2449, 2451, 101 L. Ed. 2d 352, 358 (1988).

The Supreme Court has examined this issue in two cases involving negligence claims against government when an assault caused the injuries to the claimant. *See Sheridan*, 487 U.S. at 393–94, 108 S. Ct. at

2451, 101 L. Ed. 2d at 358 (involving an assault on a civilian by an off-duty serviceman); *Muniz*, 374 U.S. at 152, 83 S. Ct. at 1852, 10 L. Ed. 2d at 809 (involving an assault on a prisoner by other prisoners). In *Muniz*, the Supreme Court relied on *Panella v. United States*, 216 F.2d 622 (2d Cir. 1954). In *Panella*, the court narrowly construed the FTCA and limited its application to claims arising from intentional torts by government employees. *Id.* at 624–25. The *Panella* decision is founded on the principle that the essence of the claim against the government is the negligence of their employees, not the assault. *Id.* at 624. To hold otherwise would exonerate the government from all liability where the injuries to the claimant were caused by an assault. *Id.*

Adopting the analysis in *Panella* and citing the holding in *Muniz*, the Supreme Court limited the intentional tort exception to cases arising out of assaults by federal employees. *Sheridan*, 487 U.S. at 398–400, 108 S. Ct. at 2454–55, 101 L. Ed. 2d at 360–62. Although we have not decided this issue under the ITCA, we find *Panella*, *Muniz*, and *Sheridan* are persuasive.

The basis of Walker's claim is not that an employee of the State inflicted an intentional tort, but rather the State was negligent in failing to protect him from an assault by another prisoner. The whole purpose of the ITCA is to waive sovereign immunity for the negligent acts of the State. To limit the State's liability whenever an assault causes the claimant's damages would relieve the State of its liability for its negligent acts. This construction of the intentional tort exception is contrary to the intent of the legislature when it enacted the ITCA. In construing statutes, we are required to determine legislative intent. *Auen v. Alcoholic Beverages Div.*, 679 N.W.2d 586, 590 (Iowa 2004). As long as the claimant can show the State is negligent in performing a duty to

protect a person from an assault, the intentional tort exception is not applicable. Accordingly, we affirm the district court's ruling on the intentional tort exception.

### IV. Disposition.

We find discretionary function and intentional tort exceptions to the ITCA do not apply under the facts of this case. Therefore, we hold the district court was correct in denying the State's motion for summary judgment. Thus, we affirm the judgment of the district court and remand this case for trial.

**AFFIRMED AND CASE REMANDED.**

All justices concur except Waterman and Mansfield, JJ., who concur in part and dissent in part.

**MANSFIELD, Justice (concurring in part and dissenting in part).**

I concur in part and dissent in part. I would find that Officer Walston's response to the "verbal altercation" involved an exercise of discretion for which the State is immune from suit under Iowa Code section 669.14(1) (2005).

First, I believe the facts are clear that prison regulations gave Officer Walston discretion in responding to the prisoner argument that occurred during the breakfast turnout. As noted by the majority, Kevin Walker criticizes Officer Walston's job performance in six different ways. However, the majority can point to only one area in which Walker conceivably did not have discretion, that is, the requirement that "a serious threat to the safety and order of the employees, offenders, or property of an institution shall be reported by the employee observing the incident." But even here, the majority notes that Walker did file a report, and the regulations do not state how promptly a report has to be filed. Unsurprisingly, in this instance, the report concerning the incident did not get filed before Walker was struck in the gym around 8:15 a.m. the same morning. In short, this part of the litigation involved an effort to second-guess a correctional officer's exercise of judgment.

Having found that Officer Walston was exercising discretion in how he managed this inmate-to-inmate confrontation, I would find the State immune from suit relating to his acts or omissions. I see no reason why Iowa's discretionary function exception cannot apply to "decisions made by the correctional staff in the supervision of inmates." Iowa Code section 669.14(1) is generally worded. It provides the State shall be immune from tort liability "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the

part of a state agency or an employee of the state, whether or not the discretion be abused." Iowa Code § 669.14(1). Thus, under the statute, the individual exercising discretion can be any state "employee," including someone performing the difficult and demanding job of a correctional officer.

Iowa Code section 669.14(1) is directly modeled after the discretionary function exception in the Federal Tort Claims Act. *See* 28 U.S.C.A. § 2680(a) (West, Westlaw through P.L. 112–24 approved July 26, 2011). As noted by the majority, there are many federal precedents applying the federal discretionary function exception to claims brought by prison inmates against prison staff.

> The great weight of the case law suggests that if a decision regarding the protection, safety, and classification of prisoners is discretionary (i.e., there are no mandatory directives), then such a decision is grounded in public policy and the discretionary function exception applies.

*Sledge v. United States*, 723 F. Supp. 2d 87, 96–97 (D. D.C. 2010) (citing numerous cases).

This outcome follows from the United States Supreme Court's decision in *United States v. Gaubert*, 499 U.S. 315, 111 S. Ct. 1267, 113 L. Ed. 2d 335 (1991). There, the Supreme Court held that, if a regulatory scheme affords discretion and the challenged actions can be said to be grounded in the policy of the regulatory scheme, the discretionary function exception applies. *Gaubert*, 499 U.S. at 324–25, 111 S. Ct. at 1274–75, 113 L. Ed. 2d at 347–48. The nature of the conduct, rather than the status of the actor, governs whether the exception applies. *Id.* at 322, 111 S. Ct. at 1273, 113 L. Ed. 2d at 346. Thus, for example, if a regulation allows for discretion in responding to a specific prison situation and the prison official's response can be said to be related to

legitimate prison policy considerations, the discretionary exception function applies and the government is immune from suit. If this case were in federal court concerning an incident that occurred in federal prison, I have little doubt that Walker would be unable to sue over Officer Walston's alleged acts and omissions.

Today's decision, however, limits the availability of the discretionary function exception to situations in which the decision involved the actual "evaluation of broad public policy factors" or the "weigh[ing of] competing ideals." This approach effectively transforms the discretionary function exception into an elites-only exemption. Correctional officers are not such an elite. They perform a dangerous, stressful, but nonetheless discretion-filled job that does not allow them the luxury of pondering broad public policy implications or weighing competing ideals.

I think *Gaubert* is a sensible construction of the statutory language and ought to be the rule in Iowa. In *Goodman v. City of Le Claire*, 587 N.W.2d 232, 238 (Iowa 1998), our court endorsed the *Gaubert* standard. We expressly disavowed earlier case law "holding that the discretionary function exception does not reach any decisions made at the operational level," such as prison guards. *Goodman*, 587 N.W.2d at 238.

Just last year, we reiterated the importance of federal precedent in this area. We said, "As the immunity for discretionary functions in our statute has its genesis in the federal tort claims act, we have been guided by federal decisions applying the doctrine." *Schneider v. State*, 789 N.W.2d 138, 146 (Iowa 2010). We have made similar statements before many times. *See, e.g., Ette ex rel. Ette v. Linn-Mar Cmty. Sch. Dist.*, 656 N.W.2d 62, 67 (Iowa 2002) ("Because the discretionary function exception has its genesis in the federal tort claims act, we have been

guided by federal decisions applying its mandate."); *Shelton v. State*, 644 N.W.2d 27, 30 (Iowa 2002) ("The Tort Claims Act is especially appropriate for applying the sometimes criticized but familiar rule that we are guided by federal decisions interpreting federal statutes on which our own statutes are modeled."); *Goodman,* 587 N.W.2d at 236 ("We have recognized that the legislature intended the Iowa State Tort Claims Act to have the same effect as the Federal Tort Claims Act because the Iowa act is modeled after the federal act. For this reason, we have given great weight to relevant federal decisions interpreting the federal act." (Citation omitted.)); *Butler v. State*, 336 N.W.2d 416, 419 (Iowa 1983) (The state discretionary function exception is "identical to the discretionary function exception of the Federal Tort Claims Act, and we are aided by federal interpretations of that provision." (Citation omitted.)); *see also Adam v. Mount Pleasant Bank & Trust Co.*, 340 N.W.2d 251, 252 (Iowa 1983) ("Because our statute is based on the federal Tort Claims Act, we assume our legislature intended it to have the same meaning as the federal statute."); *Hubbard v. State,* 163 N.W.2d 904, 911 (Iowa 1969) (same).

I agree that in some decisions since *Goodman* we seem to have followed a non-*Gaubertian* approach to the discretionary function exception. That approach, as the majority accurately explains, bears more of a resemblance to Justice Scalia's separate opinion in *Gaubert. See Anderson v. State*, 692 N.W.2d 360, 366–67 (Iowa 2005); *Madden v. City of Eldridge*, 661 N.W.2d 134, 139–40 (Iowa 2003); *Graber v. City of Ankeny*, 656 N.W.2d 157, 165–66 (Iowa 2003); *Messerschmidt v. City of Sioux City*, 654 N.W.2d 879, 882–83 (Iowa 2002). That approach also arguably revives the concept that decisions made at the operational level

cannot be subject to the discretionary function exception—a principle we said we were discarding in *Goodman.* 587 N.W.2d at 238.

Yet, in none of our prior cases have we said we were departing from *Gaubert* or overruling *Goodman.* I would not take that step today. Rather, I would continue to follow *Gaubert* and *Goodman* and apply them to the prison conditions at issue in this case.

Accordingly, I would find that Officer Walston was exercising prison-related discretion when he allegedly did not take sufficient steps to protect Walker from a threat. Officer Walston's testimony describes the prison policy considerations that entered into his decisions:

> [M]ost people, when they get loud in the middle of the day room so it draws your attention to the problem, most people—not all, as you say—are looking for an out. They're looking for the CO to become involved so they don't have to come to blows. That—that's the way it works around here a lot of times.
>
> . . . .
>
> They want you to get involved to say, hey, you need to knock that off. There ain't going to be any fighting here. I got my eyes on you. I'm watching you. Don't—don't keep going on. And that gives everybody an easy out. So they don't have to lose face to their peers inside here. . . .
>
> . . . .
>
> . . . [T]hat's the first continuum of how you deal with it. You approach them. It's your presence. You talk to them. You tell them. You see how it's going to work out. That's how it progresses.
>
> It doesn't always start from one and go to like one, two, three, four on a policy order in the way it's presented. Sometimes you have to skip over if it's—if it's turned about, you have to go to a higher degree right off the bat, but on a normal progression, it's just like minor reports. You'd go with them. You tell them not to do it. You give them a verbal warning. You give them the written. Make them do a responsibility report.

It all goes up the line unless they just don't listen and you have to go to a higher degree. You don't want to start at the top. You have to have somewhere to go.

Of course, even under my colleagues' approach, the fact finder may well decide that Officer Walston acted reasonably and thus reject Walker's claim. However, in adopting section 669.14(1), I believe the legislature intended to provide an immunity for these kinds of judgment calls by a correctional officer.

I agree with my colleagues' conclusion that the discretionary function exception does not apply to Walker's allegation that Activity Specialists Bogdanski and Stipe failed to properly supervise the exercise turnout at which Walker was actually struck and injured. This allegation appears to involve garden-variety negligence rather than an exercise of prison-related discretion. I also agree that the intentional tort exception does not apply here and thus join part III. C. of the majority opinion.

For the foregoing reasons, I concur in part and dissent in part.

Waterman, J., joins this concurrence in part and dissent in part.